193 F.3d 130 (2nd Cir. 1999)
 LISA DANGLER, as Executrix of the Estate of Richard R. Dangler, Plaintiff-Appellant, v.
NEW YORK CITY OFF TRACK BETTING CORPORATION, ALEX SHERMAN, DAVID B. CORNSTEIN, and SHERMAN JACKSON, Defendants-Appellees.
 Docket No. 98-9334
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: May 27, 1999
Decided: September 23, 1999
 
 Appeal from a judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, dismissing complaint alleging due process violations and retaliation in violation of First Amendment.
 Affirmed in part; vacated and remanded in part. [Copyrighted Material Omitted][Copyrighted Material Omitted]
 LOUIS A. MANGONE, New York, New York (Mangone & Schnapp, New York, New York, on the brief), for Plaintiff-Appellant.
 DAVID B. GOLDIN, New York, New York (Michael D. Hess, Corporation Counsel of the City of New York, Lawrence S. Kahn, Timothy J. O'Shaughnessy, New York, New York, on the brief), for Defendants-Appellees.
 Before: KEARSE, MINER, and POOLER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Lisa Dangler, as executrix of the estate of Richard R. Dangler ("Dangler"), appeals from a final judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, dismissing this action, brought principally under 42 U.S.C. §1983 (1994), alleging, inter alia, that defendants New York City Off Track Betting Corporation ("OTB") et al. violated Dangler's rights under the First Amendment by terminating his employment in retaliation for reporting suspected wrongdoing by OTB officials, and denied him due process in connection with that termination. The district court dismissed the second amended complaint ("complaint") pursuant to Fed. R. Civ. P. 12(b)(6), ruling that the individual defendants accused of First Amendment violations were entitled to qualified immunity on those claims, that the complaint otherwise failed to state a federal claim on which relief could be granted, and that the court would decline to exercise supplemental jurisdiction over the asserted state-law claims. On appeal, plaintiff contends that the court erred in dismissing the complaint; she also contends that she should have been allowed to amend the complaint further and to conduct discovery. For the reasons that follow, we vacate the dismissal of the First Amendment claims, as well as the state-law claims, and remand for further proceedings; we affirm the dismissal of plaintiff's other federal claims.
 
 I. BACKGROUND
 
 2
 OTB is a public benefit corporation created under New York law to, inter alia, operate facilities for off-track wagering on horse racing. See N.Y. Rac. Pari-Mut. Wag. & Breed. L. §601, et seq. (McKinney 1984). At the times of the events at issue here, defendant Alex Sherman was OTB's president and general manager, defendant David B. Cornstein was chairman of its board of directors, and defendant Sherman Jackson was its director of public relations.
 
 
 3
 Dangler, who died in August 1997, was an employee of OTB from 1970 until August 1995. The central thrust of the complaint was that in early 1995, Dangler learned of irregularities and possible corruption by Sherman and Cornstein, that he communicated his information to OTB's internal investigator and to the New York City Department of Investigation ("DOI"), and that as a consequence, defendants retaliated against him by, inter alia, altering the conditions of his employment, publicly disparaging him, and ultimately terminating his employment. The principal allegations of the extremely detailed complaint, which must be taken as true for the purposes of reviewing a Rule 12(b)(6) dismissal, are summarized below.
 
 
 4
 A. The Principal Allegations of the Complaint
 
 
 5
 During his 25 years of employment by OTB, Dangler held many high-level executive positions. From October 1994 until the termination of his employment, he held the position of senior vice president in charge of operations and was OTB's third-highest ranking executive. In that position, Dangler reported to OTB's president and to Robert Palumbo, its executive vice president.
 
 
 6
 In the fall of 1994, OTB used a computerized wagering system provided and maintained by Amtote International ("Amtote"); as the contract with Amtote was due to expire in October 1996, OTB began consideration of the issuance of a new contract, worth some $35,000,000, for the acquisition of a new computerized system. All OTB contracts for goods and services for amounts in excess of $10,000 were required to be awarded on the basis of competitive bidding. With respect to such contracts, the procedure was for OTB to prepare and advertise a request for proposals ("RFP") and to analyze the RFP responses before awarding a contract. It was anticipated that the companies bidding on the contract to supply OTB's new computerized betting system beginning in October 1996 would include Amtote and Autotote Corporation ("Autotote").
 
 
 7
 Sherman became OTB's president and general manager in November 1994. In January 1995, Dangler met with him and outlined the laws and regulations governing OTB contracts. Sherman expressed dissatisfaction with the fact that OTB was required to proceed in accordance with those laws and regulations. Several weeks later, an OTB official informed Dangler of overhearing a conversation between Sherman and the chairman of Autotote, which left the impression that Sherman would try to steer the contract for OTB's new computerized betting system to Autotote.
 
 
 8
 In early February, Dangler was informed by OTB's director of security and a financial division official of what they believed were irregularities surrounding the renewal of a lease for one of OTB's betting parlors in Queens, New York. They informed Dangler that the amount to be paid to the landlord included $16,000 that was characterized as a retroactive payment for security guard services provided by the landlord for the prior five years; but OTB had provided its own security services for those premises, and the landlord had never provided such services. Moreover, the landlord's earlier attempts to obtain such payments had been rejected by prior OTB management.
 
 
 9
 Dangler also was informed by Palumbo that a member of OTB's board of directors was insistent that one Joseph Horn be given an exclusive concession at a new OTB betting facility. However, Horn also owned a restaurant formerly called "Goodfellows." OTB officials had previously inspected "Goodfellows" and had observed evidence indicating that the premises were being used improperly as an "after hours" club and had seen transactions that appeared to relate to illegal conduct.
 
 
 10
 At all times pertinent to these events, OTB had a written policy requiring all employees to disclose corrupt or illegal activities at OTB. That policy, as reflected in various corporate documents, (a) "provide[d] that all employees of [OTB] are 'obligated to report any incidents of possible wrongs or corruption to the OTB Inspector General'" (Complaint ¶15 (quoting OTB Employee Handbook at 3 (Mar. 1994 ed.)) (complaint's emphasis omitted)); (b) stated that "'[a]ny employee who refuse[d] or fail[ed] to appear to answer questions as to the performance of his/her official duties before the Corporation, the [New York City] Department of Investigation, or any lawfully constituted court,'" or who, having made an appearance, "'refuse[d] to answer'" such questions or answered "'in a palpably evasive, transparently sham, false, or untruthful manner,'" would be "'subject to charges of misconduct'" (Complaint ¶16 (quoting OTB Uniform Rules of Discipline §§2.0, 2.1)); and (c) stated that "'no officer, employee, or Director of [OTB] shall take any adverse personnel action with respect to another officer or employee in retaliation for his or her making a report of information concerning corrupt or other criminal activity, conflict of interest, gross mismanagement or abuse of authority to the Inspector General.'" (Complaint ¶17 (quoting December 21, 1988 OTB Board of Directors Resolution) (complaint's emphasis omitted).)
 
 
 11
 On February 7, 1995, Dangler contacted OTB Inspector General ("OTBIG") Robert Unger and informed him of the apparently improper $16,000 payment to the Queens landlord and of the insistence on granting a concession to a person who apparently ran an illegal operation elsewhere.
 
 
 12
 Prior to February 7, Dangler had not been criticized for his work at OTB. Indeed, when OTB was attempting to downsize in December 1994 and January 1995 and was offering other executives early retirement/severance "buy-out" packages, Dangler was encouraged to remain with OTB. Palumbo informed him that everyone above Dangler in the OTB hierarchy was pleased with Dangler's work, and that although Sherman was dissatisfied with others at OTB, Sherman "loved" Dangler. (Complaint ¶21.)
 
 
 13
 On February 9 and 10, however, shortly after Dangler's first communication with Inspector General Unger, Sherman summoned Dangler to his office several times and challenged Dangler's loyalty to OTB. Sherman threatened to fire Dangler "because Mr. Dangler was unhappy with what management was doing" (Complaint ¶27); Sherman stated that he wanted only "'team players'" at OTB (Complaint ¶28). Sometime in February, Sherman, Cornstein, and others began to strip Dangler of his staff and areas of responsibility, to disparage Dangler on the basis of criticisms that were pretextual, and to embarrass and humiliate him, in retaliation for his reports to Unger.
 
 
 14
 On February 16, Dangler reported Sherman's threats to OTBIG Unger. On February 24, he relayed to Unger the information he had just received that Sherman appeared to be trying to steer the anticipated $35 million contract for the new computerized betting system to Autotote.
 
 
 15
 In the meantime, on February 21, Dangler was contacted by DOI inspector Brian Foley, who sought information from Dangler. At the ensuing meeting on February 27, Foley and two associates questioned Dangler "(a) about any conflicts of interest Mr. Dangler knew or heard about at OTB, (b) why OTB was not earning greater profits, and (c) any other wrongdoing or questionable circumstances Mr. Dangler knew or heard about at OTB." (Complaint ¶34.) Dangler gave his DOI interrogators the same information he had given OTBIG Unger as to the unwarranted payment to the Queens landlord and the granting of a concession to a restaurateur who was believed to permit unlawful activity on his premises. In addition, Dangler relayed rumors he had heard that there were interlocking board relationships between Autotote and a company of which Cornstein was chairman. As to OTB's lack of greater profitability, Dangler told Foley that Sherman had, inter alia, caused the hiring of unnecessary employees, caused those new employees to be paid higher salaries than were normal for their jobs, and awarded several persons raises that appeared to be excessive.
 
 
 16
 On February 28, Dangler reported to Unger and Foley information he had received from other OTB officials that a $120,000 contract was being awarded, at the behest of Sherman, to a company called C&C Visuals without competitive bidding. C&C Visuals was run by a friend of Sherman. Eventually a competitive bidding process was used for that contract, but only after OTB's RFP had been manipulated to afford C&C Visuals an improper advantage.
 
 
 17
 In the spring of 1995, various OTB officials, including OTBIG Unger, were summoned by DOI to give information in its investigation. Unger told Dangler that he knew Dangler had been talking with DOI, and Unger stated that "'no administration feels comfortable knowing that one of their executives is talking to the Department of Investigation, that's something they react to.'" (Complaint ¶59.)
 
 
 18
 Another OTB official informed Dangler that Sherman and another high-ranking official were attempting to force Dangler to resign. In aid of that goal, Dangler's input was no longer sought, and he was excluded from meetings of people who reported to him concerning areas for which he was responsible. Dangler was also excluded from social gatherings at which his absence was sure to cause comment; and his subordinates were threatened with adverse employment actions if they were seen socializing with him or discussing OTB affairs with him.
 
 
 19
 In May, DOI informed Sherman and other OTB officials that its investigation revealed no criminal violations and that the DOI investigation was closed. Dangler remained isolated. He complained to Palumbo about the retaliation against him and asked that his skills be utilized. Instead, on July 31, Sherman summoned Dangler and threatened to fire him unless he agreed (1) to retire on March 15, 1996 (the date on which Dangler would be eligible for maximum pension benefits), (2) to surrender all his responsibilities at OTB until March 15, 1996, and (3) to give a release to OTB, its officers, directors, and employees from all claims arising out of Dangler's employment. Dangler refused. On August 11, he was fired. Although Sherman stated at that time that Dangler could continue using his office and company car until late September, those privileges were revoked on August 24, and Dangler was then forced to pack his belongings and leave the premises.
 
 B. The District Court's Decision
 
 20
 Dangler commenced the present action in October 1995. The original complaint named only Sherman, Cornstein, and OTB as defendants, and alleged principally (a) that defendants had violated Dangler's First Amendment rights by retaliating against him for communicating with OTBIG Unger and DOI about irregularities and suspected corruption, and (b) that Dangler's termination had been effected without due process; it also asserted various state-law claims. An amended pleading added a libel and slander claim against those defendants and against Jackson, OTB's public relations director, who, according to the press, characterized the present suit as the "'rantings of a disgruntled former employee who knew that there was a great deal of dissatisfaction for a long time with his work,'" and who had "'conjured up a bogus case of having been a whistleblower.'" (Complaint ¶119.)
 
 
 21
 Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim. As to the First Amendment claims, defendants contended that the firing of Dangler for challenging the integrity of his superiors did not violate his First Amendment rights because he held a policymaking position at OTB. Sherman and Cornstein also contended that they were entitled to qualified immunity on the basis that they reasonably believed that firing a policymaker was permitted under the First Amendment. As to the due process claims, Sherman, Cornstein, and OTB contended that the complaint failed to show any deprivation of property or liberty.
 
 
 22
 In a Memorandum Opinion, see 1998 WL 599711 (S.D.N.Y. Sept. 9, 1998), the district court, although finding the complaint generally sufficient to state a First Amendment claim, ultimately concluded that the complaint should be dismissed as to all defendants. The court found that the complaint sufficiently alleged (a) that Dangler's communications to OTBIG Unger and DOI constituted speech touching on matters of public concern, which thereby warranted First Amendment protection, and (b) that that speech was a substantial factor in defendants' decision to terminate his employment. The court also noted that defendants did not contend that Dangler had been fired because of his political beliefs or affiliations, see Elrod v. Burns, 427 U.S. 347 (1976), and it concluded that "the policymaker exception" did not foreclose Dangler's First Amendment claim. 1998 WL 599711, at*8.
 
 
 23
 The court further noted that defendants did not argue that Dangler's speech had disrupted OTB's operations in any way:
 
 
 24
 Under the Pickering [v. Board of Education, 391 U.S. 563 (1968),] balancing test, ... Plaintiff's status within OTB is a factor to be weighed in determining the level of disruption in the workplace. McEvoy [v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997)]. The problem here is that Defendants have not alleged that Plaintiff's speech disrupted OTB's operations in any[ ]way. There is therefore, nothing to balance against Plaintiff's right to speak out. Accordingly, on the record before this Court, the Court cannot conclude as a matter of law that Plaintiff's First Amendment right to report his suspicions of wrongdoing at OTB was outweighed by Defendants' interest in maintaining efficient operations.
 
 
 25
 1998 WL 599711, at*9 (footnote omitted).
 
 
 26
 Nonetheless, the court dismissed Dangler's First Amendment claims against Sherman and Cornstein on the ground of qualified immunity. The court noted that at the time of Dangler's termination, "it was not clearly established in this Circuit that the policymaker exception did not immunize employers from liability in Pickering type situations," 1998 WL 599711, at*10, and it found "as a matter of law" that it was objectively reasonable for defendants to believe (a) that Dangler was a policymaker and (b) that his employment could therefore be lawfully terminated on the basis of his speech activities, id.
 
 
 27
 As to OTB, the court dismissed Dangler's First Amendment claim on the ground that the complaint did not allege facts sufficient to show that the termination of his employment was pursuant to an OTB custom or policy:
 
 
 28
 As to Defendant OTB, it is well-settled that a public benefit corporation such as OTB cannot be held liable on the basis of isolated unlawful acts of its employees. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 691 ... (1978). Since [Dangler] has failed to allege facts sufficient to support an inference that [he] was injured by actions OTB officials took in response to an OTB custom or policy, Defendant OTB cannot be held liable under §1983.
 
 
 29
 1998 WL 599711, at*9 (internal quotation marks omitted).
 
 
 30
 The district court dismissed Dangler's due process claims because the complaint failed to allege the deprivation of either a property or a liberty interest. No deprivation of property was shown because nothing in the complaint indicated that Dangler had an entitlement to continued employment. The allegations of humiliation and embarrassment, without more, did not sufficiently allege the deprivation of a liberty interest. Having dismissed all of the federal claims, the court declined to exercise supplemental jurisdiction over plaintiff's state-law claims.
 
 II. THE FIRST AMENDMENT CLAIMS
 
 31
 On appeal, plaintiff principally contends that the district court erred in dismissing the First Amendment claims. Defendants contend that the dismissal of those claims should be upheld because
 
 
 32
 (1) Dangler was a policymaker whom defendants could fire, with impunity, for his political beliefs (see Defendants' brief on appeal at 20 ("if an employee is a 'policymaker,' it is not an infringement of an employee's first amendment right of free speech or of association for the employee to be dismissed because of his or her political affiliation ....");
 
 
 33
 (2) in the balancing analysis required by Pickering v. Board of Education, 391 U.S. 563, 568 (1968) ("Pickering"), defendants must prevail because "[n]o organization, public or private, can be expected to operate when its third-highest-ranking officer, the officer in charge of contracting, runs to investigative authorities with allegations about its President as frequently as did [Dangler]" (Defendants' brief on appeal at 14; see also id. at 18-19 ("the allegations of the complaint demonstrate that [Dangler's] allegations to the OTBIG and DOI would destroy any confidence Sherman had in [Dangler's] loyalty and would not just disrupt, but would altogether foreclose, any meaningful working relationship between [Dangler], the Senior Vice President for Operations, and Sherman, the President")); and
 
 
 34
 (3) it was objectively reasonable for Sherman and Cornstein to believe it permissible to fire Dangler on either of the first two grounds.
 
 
 35
 We review these contentions under the familiar principles governing motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted. Such a dismissal is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In ruling on such a motion, the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint, see, e.g., Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996), to assume all well-pleaded factual allegations to be true, and to view all reasonable inferences that can be drawn from such allegations and documents in the light most favorable to the plaintiff, see, e.g., Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). Applying these principles to the complaint at issue here, we conclude that Dangler's First Amendment claims should not have been dismissed for failure to state a claim on which relief can be granted.
 
 
 36
 A. Defendants' Contention that Dangler Was a Policymaker Whose Employment Was Terminable Because of His Political Beliefs
 
 
 37
 Defendants' contention that Dangler was a policymaker whom defendants were entitled to fire because of his political beliefs is wide of the mark because its factual premises lack foundation in the complaint. First, the complaint did not suggest that Dangler had any particular political bent or that defendants were motivated by political concerns. Rather, it repeatedly alleged that defendants retaliated against Dangler because he relayed to investigative officials information suggesting that Sherman and Cornstein were engaging in improper and corrupt behavior.
 
 
 38
 Second, we disagree with defendants' contention that the complaint established that Dangler was a policymaker. While the complaint itemized at length Dangler's communications with OTBIG and DOI and the acts of retaliation visited upon him as a result, it revealed few details of OTB's operations or Dangler's responsibilities. Although by 1994 Dangler was OTB's third-highest-ranking officer, serving as its operations manager with numerous people reporting to him, it is not necessarily the case that a person who heads an organization's operations formulates the policies that direct the conduct of those operations or holds a position for which confidentiality or public contact is essential. And although defendants cite to a Dangler memorandum that complained of the retaliatory denial of his "access" to "the decision-making process of the executive office" (Complaint Exhibit D), the reference to such access does not establish Dangler's role as a policymaker, for plainly not all employees who give input leading to corporate decisions are makers of policy. Certainly other aspects of the complaint suggest that Dangler in fact held a role below the level of policymaker. For example, the complaint suggested that he was an employee who might receive overtime pay. (See id.) Further, the complaint indicated that Dangler's position did not empower him to speak on behalf of the corporation, its president, or its board, see generally Gordon v. County of Rockland, 110 F.3d 886, 890 (2d Cir. 1997) (power to speak on behalf of a policymaker is strong indicium of policymaking status), for it alleged that in order to serve on a public discussion panel simply as an expert on contract procurement practices, Dangler was required to obtain approval from "the appropriate OTB officials" (Complaint ¶14).
 
 
 39
 In sum, nothing in the complaint compels the conclusion that Dangler had a policymaking role or a position that authorized him to speak for the corporation.
 
 
 40
 B. Defendants' Contention that Dangler's Conduct Was Inherently Too Disruptive
 
 
 41
 Nor does the complaint support defendants' contention that they were entitled to fire Dangler because his accusations of wrongdoing were inherently disruptive. "The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Rankin v. McPherson, 483 U.S. 378, 384 (1987) ("Rankin") (quoting Pickering, 391 U.S. at 568). In the Pickering balancing test, several factors are relevant, including "the extent of the disruption caused by the employee's speech on workplace discipline, harmony among co workers, working relationships, and the employee's job performance," McEvoy v. Spencer, 124 F.3d 92, 98 (2d Cir. 1997) ("McEvoy"), as well as the responsibilities of the employee within the agency and whether the speech is made publicly or privately, see Lewis v. Cowen, 165 F.3d 154, 162 (2d Cir. 1999). Thus,
 
 
 42
 in weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where ... an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.
 
 
 43
 Rankin, 483 U.S. at 390 91. "[T]he more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." McEvoy, 124 F.3d at 103 (internal quotation marks omitted).
 
 
 44
 The content of the employee's speech is an important consideration in determining the extent of the employer's burden to show likely disruption. An employee's charge of unlawful conduct is given far greater weight than is a complaint as to the fairness of internal office operations. See, e.g., Connick v. Myers, 461 U.S. 138, 148-49 (1983); Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991). Compare Giacalone v. Abrams, 850 F.2d 79, 86-87 (1988) (complaint as to interpretation of tax law carries little weight in the balancing process), with Rookard v. Health & Hospitals Corp., 710 F.2d 41, 46 (2d Cir. 1983) (complaint of fraudulent and corrupt practices carries great weight). Thus, although the public employer normally "need show only a 'likely interference' with its operations, and 'not an actual disruption,'" Lewis v. Cowen, 165 F.3d at 163 (quoting Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir.), cert. denied, 516 U.S. 862 (1995) (emphases in Jeffries)), a public employer cannot, with impunity, fire an employee who "blew the whistle" on other employees' violations of law on the ground that those disclosures impaired office morale, Frank v. Relin, 1 F.3d 1317, 1331 (2d Cir.), cert. denied, 510 U.S. 1012 (1993); cf. Piesco v. City of New York, 933 F.2d 1149, 1158 (2d Cir.) (public employee's right to give truthful answers before a legislature's investigative committee took precedence over the employer's interest in efficiently performing government services), cert. denied, 502 U.S. 921 (1991). "In each case, the ultimate question is whether the employee's right to speak is outweighed by the public employer's interest in the effective operation of the workplace." McEvoy, 124 F.3d at 98.
 
 
 45
 In the present case, the complaint alleged that Dangler accused high-level OTB officials of improper and corrupt behavior. There can be no question that Dangler's speech therefore implicated particularly strong First Amendment interests.
 
 
 46
 Moreover, the complaint gives rise to no inference that such speech would have weighed against OTB's mission or effective operations. As set out in Part I.A. above, the complaint alleged that OTB's written policies stated, inter alia, that "all employees of [OTB] [we]re 'obligated to report any incidents of possible wrongs or corruption to the OTB Inspector General'" (Complaint ¶15 (quoting OTB Employee Handbook at 3 (Mar. 1994 ed.)) (complaint's emphasis omitted)). And any employees who failed or refused to answer questions put to them by the Inspector General or by DOI would be "'subject to charges of misconduct.'" (Complaint ¶16 (quoting OTB Uniform Rules of Discipline §§2.0, 2.1).) Thus, OTB's own written policy made such reports mandatory. When all permissible inferences from these allegations are drawn in favor of the plaintiff, as they must be in connection with a Rule 12(b)(6) motion, the conclusion is that OTB itself viewed employee reporting of possible wrongdoing and corruption by its officials not as disruptive of OTB's business but rather as advancing its interests.
 
 
 47
 Because the dismissal was based on the face of the complaint, the record was of course undeveloped as to whether other circumstances might, in the Pickering analysis, weigh in favor of the employer's termination of Dangler's employment. The complaint disclosed no such circumstances, and we conclude that defendants' contention that the complaint itself showed that Dangler's reports to OTBIG and DOI were inherently disruptive of OTB's operations, justifying termination of his employment as a matter of law on a Pickering balancing analysis, is meritless.
 
 
 48
 C. Qualified Immunity for Sherman and Cornstein
 
 
 49
 An individual defendant sued under §1983 may be entitled to qualified immunity from a suit for damages if it was objectively reasonable for him to believe that his conduct did not violate a clearly established constitutional right. See, e.g., Anderson v. Creighton, 483 U.S. 635, 641 (1987); McEvoy, 124 F.3d at 97; Robison v. Via, 821 F.2d 913, 920-21 (2d Cir. 1987). Sherman and Cornstein contend that dismissing the First Amendment claims on the ground of qualified immunity pursuant to Rule 12(b)(6) was proper because it was objectively reasonable for them to believe it constitutionally permissible to fire Dangler either (1) because he was a policymaker who could be discharged on account of his political beliefs, or (2) because the Pickering balancing process permitted it. We disagree, since neither ground is established by the complaint.
 
 
 50
 In support of the first ground, defendants rely on our recent decision in McEvoy. The complaint in McEvoy alleged that the First Amendment rights of the plaintiff had been violated when he was twice demoted, first from police commissioner to deputy chief, and then from deputy chief to captain. We held that the individual defendants were entitled to a Rule 12(b)(6) dismissal on qualified-immunity grounds because at the time of their conduct in April 1996, "the law was unsettled ... as to whether a policymaker exception was available in a Pickering case," and because the law and the complaint itself revealed that "it was objectively reasonable for the[] defendants to believe that [the plaintiff's] position ... was a policymaking one," McEvoy, 124 F.3d at 105.
 
 
 51
 However, the circumstances in McEvoy were materially different from those here. First, the complaint in McEvoy showed that it was undisputed that the first demotion of which McEvoy complained occurred when he held a policymaking position: "McEvoy himself ... alleged that ... he was a policymaker at the time of the first demotion" from commissioner to deputy chief. Id. at 104. Second, the nature of the deputy chief position, from which McEvoy was subsequently demoted, was described by state law. Thus, we noted that the powers conferred on the deputy chief's office by the Yonkers City Charter and the New York Public Officers Law included potential authority in the police commissioner's absence to "control the overall supervision of the department, discipline members of the department, and control the city jail," and "to speak on behalf of the department." Id. at 105. These provisions of law made it objectively reasonable for the individual defendants to believe that McEvoy as a deputy chief was a policymaker.
 
 
 52
 The circumstances of the present case are unlike those in McEvoy. Despite the ruling of the district court here that "as a matter of law" it was objectively reasonable for defendants to believe that Dangler was a policymaker, defendants have not called to our attention any provision of law defining Dangler's position. We know of no statute or ordinance providing, for example, that Dangler would have been acting president in the absence of Sherman and Palumbo or that Dangler had authority to speak on behalf of OTB. Since, as discussed in Part II.A. above, the complaint itself does not establish that Dangler was a policymaker and contains allegations indicating that he was not, the complaint does not establish that it was objectively reasonable for the individual defendants to believe that Dangler was a policymaker.
 
 
 53
 Accordingly, the Rule 12(b)(6) dismissal cannot be upheld on this ground. The policymaker foundation for qualified immunity, which is, of course, an affirmative defense, see Gomez v. Toledo, 446 U.S. 635, 640 (1980), remains to be established by the individual defendants at trial or on a properly supported motion for summary judgment. See, e.g., Oliver Schools, Inc. v. Foley, 930 F.2d 248, 253 (2d Cir. 1991).
 
 
 54
 Nor does the complaint at all lend itself to an inference that it was objectively reasonable for defendants to believe it permissible to fire Dangler on the Pickering ground that his reports to the OTB Inspector General and DOI were inherently disruptive of OTB operations. Although defendants argue that Dangler's accusations destroyed Sherman's confidence in Dangler and his ability to work with Dangler, it was clearly established at the time of the events here that a public employer could not, with impunity, fire an employee on the ground that his accusations of wrongdoing by other employees impaired office morale, see, e.g., Frank v. Relin, 1 F.3d at 1330. Further, as discussed in Part II.B. above, the complaint alleged that under OTB's own written policy, the reporting to OTBIG of suspected improprieties or corruption was required. And, as set out in Part I.A. above, that policy also stated that when an employee or officer made an allegation of corruption, conflict of interest, or gross mismanagement, no other officer or director was permitted to retaliate against him. (Although the district court, in discussing Dangler's due process claims, viewed the latter policy as irrelevant here because it mentioned only communications to the OTB Inspector General and not to DOI, see 1998 WL 599711, at*13, it is relevant at the very least because the complaint alleged that Sherman's threat to fire Dangler because he was not a "team player," along with other employment actions adverse to Dangler, began two days after Dangler reported his charges to the OTB Inspector General and some two weeks prior to any contact between Dangler and DOI.)
 
 
 55
 In sum, the complaint alleged a corporate policy that expressly required the very speech in which Dangler engaged and forbade adverse employment action against him by reason of that speech, thereby indicating that OTB itself believed that employee speech reporting suspected corruption would be in OTB's best interest. Given the complaint's implications as to OTB's own view, the complaint provides no basis for a ruling that the individual defendants' contrary view, i.e., that Dangler's reports of corruption were inherently adverse to OTB's mission or effective operations, was objectively reasonable.
 
 
 56
 We conclude that the individual defendants were not entitled to qualified immunity as a matter of law on the basis of the allegations of the complaint. The Rule 12(b)(6) dismissal of the First Amendment claims against Sherman and Cornstein on that ground was erroneous.
 
 
 57
 D. Dismissal of OTB for Lack of Allegation of Official Policy
 
 
 58
 The district court dismissed the First Amendment claims against OTB itself on the basis that the complaint failed to allege facts sufficient to permit an inference that Dangler's termination was an action pursuant to an OTB custom or policy. Defendants had expressly noted in their moving papers in the district court that they did not seek dismissal on that ground, and they do not attempt to defend dismissal on that ground here. Their forbearance is justified.
 
 
 59
 Although liability may be imposed on a municipal entity in an action brought under §1983 only where the alleged violation was caused by the "government's policy or custom," Monell v. Department of Social Services, 436 U.S. 658, 694 (1978), the official-policy requirement is intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible, see Pembaur v. City of Cincinnati, 475 U.S. 469, 478 80 (1986) ("Pembaur"). A government's official policy may be "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," Monell v. Department of Social Services, 436 U.S. at 694, and "where action is directed by those who establish governmental policy, the municipality is ... responsible ...." Pembaur, 475 U.S. at 481; see also Board of County Commissioners v. Brown, 520 U.S. 397, 406 (1997); Rookard v. Health & Hospitals Corp., 710 F.2d at 45. Whether a particular official has "final policymaking authority," Pembaur, 475 U.S. at 483 (plurality opinion of Brennan, J.), such that his decisions may trigger municipal liability, is to be determined by referring to state law, see, e.g., Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988) (plurality opinion of O'Connor, J.).
 
 
 60
 The complaint in the present case plainly alleged sufficient facts to permit the inference that the employment decisions adverse to Dangler were the responsibility of OTB. OTB is a public benefit corporation created by New York law. The statute that created it provides, inter alia, that the powers of OTB are vested in its board of directors, see N.Y. Rac. Pari-Mut. Wag. & Breed. L. §603, and that "the administration of its affairs," is the responsibility of the "general manager, who shall be the chief executive officer of the corporation," id. §603, subd. 13. The complaint alleged that the retaliation against Dangler was led by Sherman, OTB's president and general manager, and by Cornstein, the chairman of OTB's board. Further, the meeting at which Sherman demanded Dangler's retirement was also attended by OTB's director of personnel and its general counsel. Finally, Sherman's subsequent memorandum to Dangler stated that "the Corporation had asked [Dangler] to sign a waiver absolving OTB of any liability," and it disclosed that Sherman's actions with respect to Dangler's termination had been "discussed in detail with the []OTB Board of Directors and ... ha[d] received their approval." (Complaint Exhibit G (emphases added).)
 
 
 61
 Accordingly, the dismissal of the First Amendment claim against OTB for failure to allege sufficiently that Dangler's termination was an action attributable to OTB was error.
 
 III. OTHER CLAIMS AND CONTENTIONS
 
 62
 Plaintiff also contends that the district court erred in dismissing the complaint's due process claims. We disagree. The district court properly dismissed those claims because the complaint failed to allege a deprivation of either a property interest or a liberty interest. We affirm the dismissal of those claims substantially for the reasons stated in the district court's opinion, see 1998 WL 599711 at*11-*14.
 
 
 63
 Finally, plaintiff contends that the district court should have allowed a further amendment to the complaint and should have allowed discovery of certain documents. We see no abuse of discretion in the district court's refusal to allow a further amendment to the complaint. We do not suggest, however, that the court may not allow further amendment or the filing of a supplemental complaint on remand, should it deem such a course appropriate.
 
 
 64
 We do not address plaintiff's discovery contentions for two reasons. First, as to any given discovery request, it is unclear from plaintiff's brief on appeal whether it related to the First Amendment and state-law claims or only to claims whose dismissal has not been overturned. Second, the substance of plaintiff's discovery contentions is not fully presented, as she purports to incorporate by reference the arguments she made to the district court. "Merely incorporating an argument made to the district court," however, "does not preserve a question for appellate review." Frank v. United States, 78 F.3d 815, 833 (2d Cir. 1996), vacated on other grounds, 521 U.S. 1114 (1997) (mem.).
 
 
 65
 To the extent that the prior discovery rulings related to the First Amendment and state-law claims, those rulings resume their status as interlocutory orders and remain subject to modification by the district court at any time prior to the entry of final judgment. We decline to review them at this time.
 
 CONCLUSION
 
 66
 We have considered all of plaintiff's contentions on this appeal and, except to the extent noted above with respect to the First Amendment claims, have found them to be without merit. The judgment of the district court is vacated insofar as it dismissed the First Amendment claims and the pendent state-law claims, and the matter is remanded for further proceedings, including appropriate discovery, on those claims. In all other respects, the judgment of the district court is affirmed.
 
 
 67
 Costs to plaintiff.