Joseph LOCURTO, Plaintiff,

v.

Rudolph GIULIANI, Mayor of the City of New York, Howard Safir, Commissioner of the New York City Police Department, and the City of New York, Defendants.

Robert Steiner, Plaintiff,

v.

Rudolph Giuliani, Mayor of the City of New York, Thomas Von Essen, Commissioner of the New York City Fire Department, and the City of New York, Defendants.

Jonathan Walters, Plaintiff,

v.

Rudolph Giuliani, Mayor of the City of New York, Thomas Von Essen, Commissioner of the New York City Fire Department, and the City of New York, Defendants.

Nos. 98 Civ. 6495(JES), 98 Civ. 6505(JES), 98 Civ. 6567(JES).

United States District Court, S.D. New York.

April 27, 2000.

New York, Civil Liberties Union Foundation, New York City (Christopher Dunn, Norman Siegel, of counsel) for Plaintiff Joseph Locurto.

Sullivan & Liapakis, P.C., New York City (Michael N. Block, of counsel), for Plaintiff Jonathan Walters.

Ronald E. Kliegerman, New York City, for Plaintiff Jonathan Walters.

Robert DiDio, Kew Gardens, NY, for Plaintiff Robert Steiner.

Michael D. Hess, Corp. Counsel of City of New York, New York City (Alan M. Schlesinger, John F. Wirenus, Assist. Corp. Counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs Joseph Locurto, Robert Steiner and Jonathan Walters (collectively "plaintiffs") bring this action pursuant to 42 U.S.C. § 1983 alleging, *inter alia*, that defendants Mayor Rudolph Giuliani, Commissioners Howard Safir and Thomas Von

Essen and the City of New York (collectively "defendants"), violated their right to free speech protected by the First Amendment to the United States Constitution. Before the Court are the parties' motions for summary judgment. For the reasons stated below the parties' motions are denied.

## BACKGROUND

On Monday, September 7, 1998, plaintiffs Joseph Locurto, Robert Steiner, and Jonathan Walters, a police officer and two firemen respectively, participated in the annual Labor Day Parade in Broad Channel, Queens. *See* Complaint of Officer Joseph Locurto ("Locurto Complaint") at ¶ 1; Amended Complaint of Robert Steiner ("Steiner Complaint") at ¶ 17; Amended Complaint of Jonathan Walters ("Walters Complaint") at ¶ 1; Answer at ¶ 1. Plaintiffs, who were wearing blackface, rode atop a float entitled "Black to the Future" that purportedly parodied African–Americans. *See* Locurto Complaint at ¶¶ 18, 22; Steiner Complaint at ¶ 17; Walters Complaint at ¶ 17; Memorandum of Law in Support of Defendants' Cross–Motion for Summary Judgment ("Defs.Crs.Mot.") at 2–3. Plaintiffs were not in uniform during the parade; rather, they participated in their capacity as individual members of the community. *See* Locurto Complaint at ¶ 26; Steiner Complaint at ¶ 18; Walters Complaint at ¶ 18; Defs. Crs. Mot. at 2–3.

Plaintiff Joseph Locurto, 30, a life-time resident of Broad Channel, was a police officer with the New York City Police Department from February 1994 until his termination on October 10, 1998. *See* Locurto Complaint at ¶¶ 12, 16; Answer at ¶ 12. During this period, he was assigned to the 104th Precinct in Queens, New York, a racially mixed precinct. *See* Locurto Proposed Rule 56.1 Statement of Facts ("Locurto Rule 56.1 Stmt."), Exhibit ("Ex.") A at 96. Over the course of his four and one-half years as a police officer, Locurto made 30–35 arrests and received an award for apprehending a fleeing felon.

*See id.* at 94–95. Locurto never fired a weapon or used his nightstick, and he was never involved in any violent or racial incidents. *See id.* at 94–96.

Steiner and Walters were employed by the Fire Department of New York ("FDNY") until their termination on October 26, 1998. *See* Notice of Motion, Exhibit B, The City of New York Office of Administrative Trials and Hearings ("OATH"), Report and Recommendation of ALJ Rosemarie Maldonado, dated October 16, 1998, ("Maldonado R & R"), at 3–4. Steiner joined the Fire Department in February 1996. *See* Notice of Motion, Exhibit C, Tr. of *FDNY v. Steiner and Walters,* dated October 6–7, 1998 ("FDNY Tr."), at 228–229. His most recent position was as firefighter of Ladder 17 in the South Bronx. *See id.* Other than the charge for which he was found guilty in October 1998, Steiner has never been involved in any racial incidents. *See id.* Walters worked in Engine Company 231 in the Brownsville section of Brooklyn, a predominantly African–American and Hispanic neighborhood, for the three years preceding his termination in October 1998. *See id.* at 281–82. Both Steiner and Walters have lived in Broad Channel all of their lives, and have participated in the parade with largely the same group of men from the neighborhood during the last nine years. *See* Maldonado R & R at 4.

On the evening of September 6, 1998, plaintiffs Locurto and Walters attended a barbeque at Steiner's house. *See* Locurto Complaint at ¶ 17; FDNY Tr. at 298. There, they discussed the possibility of designing a float for the parade the following afternoon. *See* Locurto Rule 56.1 Stmt. Ex. A at 98–100; FDNY Tr. at 105. Plaintiffs contemplated the titles "Gottizilla" and "Black to the Future." *See id.* Upon leaving the barbeque at around 9:00 p.m. to work the night shift, Locurto, an Italian–American himself, was under the impression that the float would be named "Gottizilla." *See id.* Accordingly, he thought that the float would depict Italian–

Americans with a Godzilla theme. *See id.* However, when Locurto arrived at Steiner's house the following day at approximately 12:45 p.m., he noticed that the theme of the float had been changed to "Black to the Future." *See* Locurto Rule 56.1 Stmt. Ex. A at 101–02. Allegedly, the theme had changed because the participants were unable to complete the "Gottizilla" float in time for the parade. *See id.* at 159; Defendants' Notice of Motion, Exhibit A, Report and Recommendation of Deputy Commissioner Rae Downes Koshetz dated October 7, 1998 in *New York City Police Department v. Joseph Locurto* ("Koshetz R & R"), at 6.

The parade commenced at approximately 1:30 p.m. *See* Locurto Rule 56.1 Stmt. Ex. A at 169–171. Plaintiffs' float was the last in the parade and didn't leave the starting point until 2:00 p.m. *See id.* The entire parade route took around an hour to traverse, however, the parade was canceled at 2:30 p.m. due to rain. *See id.* at 171. Hence, the "Black to the Future Float" made it through only the first half of the parade and never arrived at the viewing table where the politicians judging the floats were stationed. *See id.* at 105.

A tape of the parade depicting the "Black to the Future" float was aired on CBS the following night, Tuesday, September 8, 1998. *See id.* at 196. The media portrayed the float as racist. *See id.* at 205. In response to the incident, Mayor Giuliani stated that any city employee involved in the float would be fired. *See id.* at 206–7. Specifically, Giuliani was quoted in the Friday, September 11, 1998 edition of *The New York Times* as stating, "I've spoken to Commissioners Safir and Von Essen . . . and we all agree that any police officer, firefighter or other city employee involved in this disgusting display of racism should be removed from positions of responsibility immediately. . . . They will be fired." *See* Answer, Exhibit A, David W. Chen, *Officers and Firemen Wore Blackface on Float, Officials Say*, Sept. 11, 1998, at B1. On the same day that Giuliani

made this statement, Locurto became aware that the NYPD wanted to speak to him regarding his participation in the parade. *See* Locurto Rule 56.1 Stmt. Ex A at 113. At this time, Locurto contacted counsel and came forward. *See id.* at 212. Before being asked any questions about his involvement in the parade, Locurto was suspended from his job without pay. *See id.* at 113–14. On Saturday, September 12, 1998, Mayor Giuliani stated publicly, "The only way this guy gets back on the police force is if the Supreme Court of the United States tells us to put him back." *See* Answer, Exhibit B, Kit R. Roane, *Suspended Officer Apologizes, Calling Float 'a Big Mistake'*, N.Y.Times, September 13, 1998, at 51. The following day, Locurto held a press conference from his attorney's office. *See* Locurto Rule 56.1 Stmt. Ex. A at 114, 213. He publicly apologized for his conduct and admitted that he had made a mistake. *See id.*

On Monday, September 14, 1998, the New York Police Department ("NYPD") filed two formal charges against Locurto. *See* Locurto Rule 56.1 Stmt. Ex. F, Charges and Specifications. Plaintiff Locurto was charged with violating P.G. 104–01, pg. # 3, para. # 4, ("Specification No. 1"), alleging that he engaged in "conduct prejudicial to the good order, efficiency and discipline of the Department, to wit: said Officer did participate in and appear on a Labor Day parade float which depicted African–Americans in a demeaning and offensive manner." *See id.* In addition, Locurto was charged with violating P.G. 104–01 pg. # 3, para. # 2(a), ("Specification No. 2"), for "knowingly associating with person(s) or organization(s) advocating hatred, or oppression of, or prejudice toward a racial or religious group." *See id.*

On October 5, 1998, a hearing took place at the NYPD. *See* Locurto Rule 56.1 Stmt. at 1. Oral argument was held the following day before the NYPD Trial Commissioner, Honorable Rae Downes Koshetz. Police Department procedural rules require the

Deputy Commissioner of Trials to issue a Report and Recommendation to the Police Commissioner following a hearing before him/her. *See* 38 RCNY § 15–06. The Police Commissioner then makes the final determination after reviewing the Report and Recommendation and the record of the hearing. *See id.* at § 15–08. He may approve or modify the findings of the Deputy Commissioner of Trials. *See id.* As such, Koshetz recommended that Locurto be found guilty of Specification No. 1 and that Specification No. 2 be dismissed. *See* Koshetz R & R at 15. This recommendation was adopted, effective October 10, 1998, by Howard Safir, the Commissioner of the NYPD. *See* Notice of Motion, Ex. D, Final Order and Dismissal. In adopting the recommendation, Safir did not state whether or not he agreed with the facts found by Koshetz. *See id.*

As a result of their participation in the "Black to the Future" float in the September 7, 1998 Broad Channel Labor Day Parade, firefighters Jonathan Walters and Robert Steiner were suspended by the New York Fire Department ("FDNY"). *See* Maldonado R & R at 3. They were subsequently charged with violating section 25.1.3 of the Regulations for the Uniformed Force for bringing "reproach and discredit to the Fire Department, violat[ing] their oaths of office, and engag[ing] in conduct which aroused racial hatred." *See id.* All Fire Department hearings are conducted before an Administrative Law Judge ("ALJ") at the Office of Administrative Trials and Hearings ("OATH"). *See* 3 RCNY § 2–01. The presiding ALJ submits a record of the hearing and a Report and Recommendation to the Fire Commissioner. *See id.* The ultimate determination is made by the Fire Commissioner. *See id.* Accordingly, a hearing was held before the City of New York OATH on October 6 and 7, 1998. *See* Maldonado R & R at 2–3. Maldonado recommended to Commissioner Thomas Von Essen that Walters and Steiner be terminated for bringing reproach and discredit to the Fire Department and for

violating the oath of office. *See id.* at 28, 30. Further, she recommended that the charge for "arous[ing] racial hatred" be dismissed. *See id.* at 28.

Despite Fire Commissioner Von Essen's alleged statement that "his hands were tied" as a result of Giuliani's order to fire any public employee involved in the "Black to the Future" float, Maldonado rejected plaintiffs' allegations that they were fired in retaliation for their speech. *See* Maldonado R & R at 27. Rather, she found that the Department offered legitimate reasons for terminating Walters and Steiner, and that the termination was a consequence of their despicable actions, and not in retaliation for the content of their speech. *See id.* In assessing Maldonado's recommendations, Von Essen noted the egregiousness of the behavior of the firefighters, and reviewed their personnel and disciplinary records. *See* Notice of Motion, Ex. E, Commissioner's Decision Dated October 26, 1998. Von Essen adopted Maldonado's findings of fact and recommendations, and the termination of Walters and Steiner was ordered effective on October 26, 1998. *See id.*

### *DISCUSSION*

Summary judgment is appropriate where "there is no genuine issue as to any fact ... and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the movant carries the burden of demonstrating the absence of any genuine issue of material fact, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party must enumerate "specific facts and circumstances supported by depositions, affidavits based on personal knowledge,

and admissions" that create a rational inference in his favor and may not rely on conclusory allegations or denials. *General Elec. Co. v. New York State Dept. of Labor*, 936 F.2d 1448, 1452 (2d Cir.1991).

In considering a defendant's motion for summary judgment, the Court views all facts and construes all rational inferences derived therefrom in the light most favorable to the plaintiff. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, absent a showing of a genuine issue of material fact by the plaintiff, it is appropriate for the Court to grant summary judgment, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The parties raise numerous arguments why the Court should grant each summary judgment. Plaintiffs principally rely on the Supreme Court's seminal decision in *Pickering v. Board of Education of Township High School District 205, Will County, Ill.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and its progeny. In sum and substance, plaintiffs argue that they are entitled to summary judgment because defendants' decision to terminate them violated their rights to engage in free speech protected by the First Amendment to the United States Constitution. In opposition defendants claim that plaintiffs' conduct is not protected by the First Amendment. More significantly to this disposition of the motions currently before the Court, and the main subject of the following discussion, defendants argue that plaintiffs are barred, either under the doctrines of collateral estoppel or res judicata, from re-litigating the facts and/or the First Amendment "findings" made by the respective administrative law judges. After a careful review of the entire administrative record and the parties' voluminous submissions, the Court concludes that material issues of fact as to the fairness of the

administrative process prevents a grant of summary judgment at this time on any of the issues raised by the parties in their respective motions.

■■■ It is well-settled that state administrative factfindings are entitled to preclusive effect in a subsequent § 1983 action "when a state agency is acting in a judicial capacity ... [and] resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *University of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (internal citations omitted); *Doe v. Pfrommer*, 148 F.3d 73, 79–80 (2d Cir.1998). Such factfinding must be given the same preclusive effect "to which it would be entitled in the State's courts." *Id.* Under New York law, collateral estoppel applies "when the identical issue necessarily must have been decided in the prior action and will be decisive in the present action and the party to be precluded from litigating the issue must have had *a full and fair opportunity to contest the prior determination.*" *Pfrommer*, 148 F.3d at 79 (emphasis added). Moreover, in the context of administrative determinations, before applying the doctrine of collateral estoppel, New York law requires an agency's determination to be "quasi-judicial" in nature rather than legislative. *See id.*

While it is clear that an agency's factfindings are, under certain circumstances, entitled to preclusive effect in a later filed federal suit, there is a split among the Circuits whether a party is likewise barred from challenging an administrative agency's unreviewed conclusions of law. The Ninth Circuit, in a case similar to the instant action, held that an unreviewed administrative adjudication is entitled to collateral estoppel effect as to both the legal and factual determinations in a subsequently filed § 1983 action alleging a violation of a plaintiff police officer's First Amendment rights. *See Eilrich v. Remas*, 839 F.2d 630, 632–33 (9th Cir.1988); *Miller v. County of Santa Cruz*, 39 F.3d 1030,

1032–35 (9th Cir.1994) (same). The *Eilrich* court reasoned that the unreviewed legal and factual determinations of an administrative agency were entitled to preclusive effect in order to prevent litigants from attempting to avoid state review of their claims by bringing suit in federal court. *See id.* Other Circuits to consider the issue have, however, rejected the approach adopted in *Eilrich. See Dionne v. Mayor and City Council of Baltimore,* 40 F.3d 677, 685 (4th Cir.1994) (refusing to applying res judicata to unreviewed legal conclusions of administrative agency); *Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 192–93 (3d Cir.1993) ("It is the legal issue, the Commission's constitutional ruling, that we think is beyond the scope of the Elliot holding."); *Peery v. Brakke,* 826 F.2d 740, 746 (8th Cir.1987) (same); *Gjellum v. City of Birmingham,* 829 F.2d 1056, 1064–65 & n. 21 (11th Cir.1987) (same). The question in this Circuit is, as yet, undecided. *See DeSario v. Thomas,* 139 F.3d 80, 86–87 (2d Cir.1998) (discussing Circuit split without deciding whether a federal suit arising out of same transactions as an unreviewed administrative decision is barred by res judicata), *judgment vacated on other grounds by Slekis v. Thomas,* 525 U.S. 1098, 119 S.Ct. 864, 142 L.Ed.2d 767 (1999).

■ The Court need not decide whether plaintiffs' claims are barred by collateral estoppel or res judicata at this time since material questions of fact regarding the fairness of plaintiffs' administrative hearings, a prerequisite to the application of either doctrine, precludes a grant of summary judgment.[1] Plaintiffs make numerous factual allegations regarding the absence of a neutral decisionmaker and other procedural irregularities that raise sufficient questions to survive defendants' motion. For example, comments made by Mayor Giuliani that he and Commissioners Safir and Von Essen had determined prior to plaintiffs' respective hearings that plaintiffs would be terminated raises factual questions regarding the fairness of the administrative process. *See* Answer at ¶ 30 (directing the Court to a *New York Times* article dated Friday September 4, 1998 quoting the Mayor as stating that "I've spoken to Commissioners Safir and Von Essen ... and we all agree that any police officer or other city employee involved in this disgusting display of racism should be removed from position of responsibility immediately.... They will be fired."). Another statement allegedly made by Commissioner Von Essen that he would not have terminated Steiner and Walters, "but his hands were tied," raises further questions regarding whether plaintiffs received a fair opportunity to defend the charges leveled against them at the OATH hearing, or present their First Amendment claims in a fair and neutral judicial setting. *See* Maldonado R & R at 27. These, and other allegations made by plaintiffs regarding their inability to take certain discovery, *see* Locurto's Memorandum of Law in Opposition to Defendants' Cross–Motion for Summary Judgment at 12–13; Walters' Memorandum of Law in Opposition to Defendants' Cross–Motion for Summary Judgment at 14–15, raise sufficient factual questions regarding the fairness of the administrative process as to warrant a denial of defendants' motion for summary judgment on the issue of collateral estoppel at this time.

It follows from the preceding discussion that the Court must deny the parties' motions for summary judgment on plaintiffs' First Amendment claims.[2] If discovery

---

1. For the same reasons, the Court denies defendants' motion for summary judgment based on the *Rooker–Feldman* doctrine.

2. The Court's conclusion that the current record before the Court is sufficiently incomplete as to warrant a denial of the parties' motions for summary judgment is supported by *MacDonald v. Safir,* 206 F.3d 183 (2d Cir.2000). In *MacDonald,* the Second Circuit reversed the district court for granting judgment to defendant in an action challenging defendant's refusal to grant plaintiff a parade permit where the record regarding defendant's

regarding the fairness of the administrative process confirms plaintiffs' allegations that they were not afforded a full and fair opportunity to present their First Amendment claims, then the administrative findings made therein will not be entitled to any preclusive effect whatsoever. The Court will then be in a position, whether by motion or trial, to assess the merits of plaintiffs' claims without reference to the administrative record. On the other hand, if the evidence demonstrates that plaintiffs did in fact receive an opportunity to present their claims in a forum consistent with notions of fairness and due process, then the administrative decisions recommending plaintiffs' terminations may be entitled to preclusive effect that may ultimately serve to bar plaintiffs' claims in this forum. *See supra* at 166–67. For all of these reasons, the parties' motions for summary judgment on plaintiffs' First Amendment claims are denied without prejudice.[3]

 The only issue left for the Court to address is defendants' motion for qualified immunity for Mayor Giuliani and Commissioners Safir and Von Essen "to the extent they are sued in their individual capacities." Defs. Crs. Mot. at 24. An individual defendant sued for damages under § 1983 may be entitled to qualified immunity if it was objectively reasonable for him to conclude that his actions did not violate a clearly established constitutional right. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 140–41 (2d Cir.1999). Defendants argue that they are entitled to qualified immunity because plaintiffs have failed to state a viable claim under the First Amendment or the Due Process Clause or demonstrate that a rea-

sonable government official in defendants' position would have concluded that they violated plaintiffs' rights. *See* Defs. Crs. Mot. at 25. The Court disagrees with defendants, as discussed above, that plaintiffs have failed to state a claim or, given the murky factual record before the Court, that defendants' actions were objectively reasonable.[4] Therefore, defendants' motion for summary judgment on the ground of qualified immunity must be denied.

## CONCLUSION

For the reasons set forth above, plaintiffs' motions for summary judgment shall be and hereby are denied without prejudice and defendants' cross-motion for summary judgment shall be and hereby is denied without prejudice. The parties are directed to engage in discovery directed to the issues raised by the Court in this Memorandum Opinion and Order and said discovery shall be completed on or before September 1, 2000. Should the parties require the assistance of the Court regarding discovery, they are directed to contact the Court to arrange a Pre–Trial Conference.

It is **SO ORDERED.**

---

practice of evaluating permit applications was incomplete. *See id.* at 193.

3. Defendants' motion for summary judgment on plaintiffs' due process claims obviously fail at this stage of the litigation for the same reasons that the Court denies their motion for summary judgment on plaintiffs' First Amendment claims.

4. Since it was clearly established at the time the events in the instant action took place that

before taking an adverse employment action a government employer was required to provide an employee with a hearing that comported with notions of due process, the Court cannot conclude, giving plaintiffs every reasonable inference as to the irregularities surrounding the hearings that culminated in their dismissal, that defendants are entitled to qualified immunity as a matter of law.