235 F.3d 769 (2nd Cir. 2000)
 RICKY BROWN, on behalf of himself and all other persons similarly situated; JAMEL CHAMPEN, on behalf of himself and all other persons similarly situated; SHERYL CHAMPEN, on behalf of herself and all other persons similarly situated; HOPETON GORDON, on behalf of himself and all other persons similarly situated; JEAN CANTAVE, on behalf of himself and all other persons similarly situated; RAISHAWN MORRIS, on behalf of himself and all other persons similarly situated; TIM RICHARDSON, on behalf of themselves and all other persons similarly situated; DARRYL TAYLOR, on behalf of themselves and all other persons similarly situated; ROBERT WALKER, on behalf of themselves and all other persons similarly situated; CLEMENT MALLORY, on behalf of themselves and all other persons similarly situated; RONALD SANCHEZ, on behalf of themselves and all other persons similarly situated; DARNELL LEMONS, on behalf of themselves and all other persons similarly situated; JOHN BUTLER, on behalf of themselves and all other persons similarly situated; JASON CHILDS, on behalf of themselves and all other persons similarly situated; PAUL HEYWARD, JR., on behalf of themselves and all other persons similarly situated; RONALD JENNINGS, on behalf of themselves and all other persons similarly situated; PAUL HOWE, on behalf of themselves and all other persons similarly situated; BUBU DEMASIO, on behalf of themselves and all other persons similarly situated; WILSON ACOSTA, on behalf of themselves and all other persons similarly situated; CHRIS HOLLAND, on behalf of themselves and all other persons similarly situated; JERMAINE ADAMS, on behalf of themselves and all other persons similarly situated; FELIX FRANCIS, on behalf of themselves and all other persons similarly situated; DANIEL SONTAG, on behalf of themselves and all other persons similarly situated; RONALD LYNCH, on behalf of themselves and all other persons similarly situated; KENNETH McCLAIN, on behalf of themselves and all other persons similarly situated; HERVEY PIERRE, on behalf of themselves and all other persons similarly situated; VINCENT QUINONES, on behalf of themselves and all other persons similarly situated; LAURENCE PLASKETT, on behalf of themselves and all other persons similarly situated; LAMONT WYCHE, on behalf of themselves and all other persons similarly situated; STEVEN YORK, on behalf of themselves and all other persons similarly situated; TYRONE LOHR, on behalf of themselves and all other persons similarly situated; KING GONZALEZ, on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellants,
RAISHAWN MORRIS, Appellant,
CHARLES BATTISTE, on behalf of himself and all other persons similarly situated; WAYNE LEWIS, on behalf of himself and all other persons similarly situated; MICHAEL CHRISTIAN, on behalf of themselves and all other persons similarly situated; MAJOR BARNETT, on behalf of himself and all other persons similarly situated, Plaintiffs,
v.
CITY OF ONEONTA, NEW YORK; POLICE DEPARTMENT OF THE CITY OF ONEONTA, NEW YORK; JOHN J. DONADIO, Chief of Police of the City of Oneonta, in
his individual and official capacities; JOSEPH REDMOND, Oneonta Police Officer, in his individual and official capacities; WILLIAM M. DAVIS, Oneonta Police Officer, in his individual and official capacities; X. OLSEN, Oneonta Police Officer, in his individual and official capacities; ANONYMOUS OFFICERS AND INVESTIGATORS OF THE POLICE DEPARTMENT OF THE CITY OF ONEONTA, in their individual and official capacities; THE STATE OF NEW YORK; STATE UNIVERSITY OF NEW YORK; STATE UNIVERSITY OF NEW YORK, COLLEGE AT ONEONTA ("SUCO"); NEW YORK STATE DIVISION OF STATE POLICE; H. KARL CHANDLER, New York State Police Investigator, in his individual and official capacities; ROBERT FARRAND, New York State Police Troop C Commander, in his individual and official capacities; GEORGE CLUM, New York State Police Investigator, in his individual and official capacities; KEVIN MORE, New York State Police Investigator, in his individual and official capacities; JOHN WAY, New York State Police Investigator, in his official capacities; MARK KIMBALL, New York State Trooper, in his individual and official capacities; KENNETH GRANT, New York State Trooper, in his individual and official capacities; NEW YORK STATE TROOPER FARRAGO, in his individual and official capacities; ANONYMOUS STATE POLICE OFFICIALS AND INVESTIGATORS, in their individual and official capacities; SUCO DEPARTMENT OF PUBLIC SAFETY; MERRITT HUNT, SUCO Department of Public Safety Officer, in his individual and official capacities; TIM JACKSON, SUCO Department of Public Safety Officer, in his individual and official capacities; JOHN EDMONDSON, SUCO Department of Public Safety Officer, in his individual and official capacities; HARTMARK LEIF, in his individual and official capacities; ERIC WILSON, in his individual and official capacities; CARL SHEDLOCK, Oneonta Police Officer, in his individual and official capacities; ANONYMOUS PUBLIC SAFETY OFFICERS, in their individual and official capacities; ANONYMOUS SUCO COMPUTER EMPLOYEES, in their individual and official capacities; SEAN RALPH, Otsego County Sheriff's Deputy; CHRIS LEHENBAUER, Otsego County Sheriff's Deputy; ANONYMOUS OTSEGO CITY; ANONYMOUS OTSEGO COUNTY SHERIFF'S DEPUTIES, INVESTIGATORS AND/OR OFFICERS, Defendants-Appellees.
 Docket No. 98-9375
August Term 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 December 18, 2000
 
 At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the 18th day of December two thousand.
 A petition for rehearing and rehearing in banc from the amended opinion of the panel filed on August 8, 2000 having been filed by plaintiffs-appellants,
 Upon consideration by the panel that Decided the appeal, it is Ordered that said petition for rehearing is hereby DENIED.
 It is further noted that the petition for rehearing in banc having been transmitted to the judges of the Court and to any other judge that heard the appeal and a request for an in banc vote having been made by a judge of the Court in regular active service, and a poll of the judges in regular active service having been taken, and there being no majority in favor thereof, rehearing in banc is DENIED.
 Judges Kearse, Calabresi, Parker, Straub and Sotomayer dissent from the denial of rehearing in banc. Chief Judge Walker has filed an opinion concurring in the denial of rehearing in banc. Judge Jacobs has filed a separate concurring opinion and Judges Sack and Katzmann together have filed a separate concurring opinion. Judge Calabresi has filed a separate opinion dissenting from the denial of rehearing in banc which is joined by Judge Straub, and by Judges Sotomayor and Parker in part. Judge Straub has also filed a separate opinion dissenting from the denial of rehearing in banc which is joined by Judge Calabresi.
 JOHN M. WALKER, Jr., Chief Judge, concurring in the denial of rehearing in banc:
 The reasoning in support of the panel's decision, fully set forth in the panel opinion, needs no elaboration. See Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 2000). Some of the judges dissenting from denial of rehearing in banc, however, have chosen this occasion to advance, for the first time, novel equal protection theories that, in my view, would severely impact police protection. While such new theories are common to the pages of an academic journal to which interested critics might reply in the fullness of time, their appearance in this venue requires a more immediate response.
 The dissenters propose that when the police have been given a description of a criminal perpetrator by the victim that includes the perpetrator's race, their subsequent investigation to find that perpetrator may constitute a suspect racial classification under the equal protection clause. Judge Straub's view is that equal protection review is triggered whenever the police rely on a physical description provided by a victim or witness that includes race as the basis for conducting an investigation. Judge Calabresi believes that equal protection review arises in a slightly narrowed, yet related situation: when the police ignore the non-racial components of the provided description and question persons who, except for the racial descriptor, do not fit the description provided.
 The fact that no legal opinion, concurrence, dissent (or other judicial pronouncement) has ever intimated, much less proposed, any such rules of equal protection confirms a strong intuition of their non-viability. But, for the benefit of anyone who in the future may be undeterred by the inability of these theories to attract judicial recognition, their practical difficulties and analytical defects should be recognized.
 I. General Concerns
 For better or worse, it is a fact of life in our diverse culture that race is used on a daily basis as a shorthand for physical appearance. This is as true in police work as anywhere else. The theories suggested by the dissenters would require a police officer, before acting on a physical description that contains a racial element, to balance myriad competing considerations, one of which would be the risk of being subject to strict scrutiny in an equal protection lawsuit. Moreover, the officer frequently would have to engage in such balancing while under the pressure of a time-sensitive pursuit of a potentially dangerous criminal. Police work, as we know it, would be impaired and the safety of all citizens compromised. The most vulnerable and isolated would be harmed the most and, if police effectiveness is hobbled by special racial rules, residents of inner cities would be harmed most of all.
 There have been times and places in this country in which the police have tolerated crime in African-American communities. See, e.g., John Dollard, Caste and Class in a Southern Town (1937). They have done this on a variety of assumptions, all of them degrading, and one of them was that the victims in these neighborhoods were somehow less important to the then dominant white community from which the police drew their support. Although still imperfect, the more racially diverse police of today generally strive to serve and protect those within African-American communities as they do those within every other community.
 I have little doubt that the rules of constitutional law proposed by my colleagues would weaken police protection within all communities. Regrettably, the social costs of frustrating police investigations receive no mention in either dissent. In my view, it is a grave mistake to seize upon an idea that would alter police work and law enforcement procedures fundamentally without fully considering its effect on those most vulnerable to crime.
 In addition to potentially chilling police protection, and tying up officers in added court proceedings, these new rules would be implicated in many ordinary police investigations. As a result, these rules would likely undermine the strict scrutiny standard itself, because apprehending dangerous criminals in almost all instances would constitute a compelling state interest. Frequent satisfaction of strict scrutiny as police go about their daily work of investigating crime would likely have spillover effects into other areas of equal protection law, diluting the standard's efficacy where we would want it to retain its power.
 II. Judge Straub's Proposal
 The panel determined in this case that the police interviews of African-Americans in Oneonta--conducted in the hope of finding a person fitting the victim's description of the perpetrator, a young, African-American male with a cut on his hand--did not trigger equal protection scrutiny because the officers, by acting on the basis of a description provided by the victim, proceeded in a race neutral manner, and limited their search for a suspect to persons fitting the victim's description.
 The rule that Judge Straub proposes is far broader and more trouble-prone than any possible emanations from the fact-specific holding of the panel opinion. Judge Straub suggests that whenever the police use a racial descriptor, they are employing a suspect racial classification, and should therefore be subject to strict judicial scrutiny. Indeed, under his theory, the police would face litigation even where the racial descriptor is combined with other common descriptors such as age, gender, and a physical marking (as was the case here), even if the police adhere faithfully to that description, and "regardless of [its] source." See post at 2 (Straub, J. dissenting) (emphasis in original).
 
 
 1
 This rule would impede the most routine police work, particularly criminal investigations. A description of a perpetrator received by the police will often include only general attributes such as the perpetrator's race, height and sex. If strict scrutiny were triggered by the mere presence of a racial descriptor, an officer would be subject to a lawsuit simply for trying to supplement a sparse description--and thereby narrow the field of potential suspects--by interviewing other persons who fit the racial description but are not yet suspects. Indeed, the police would be employing a suspect racial classification (and thus would be required to show a compelling state interest) whenever they "use" a racial descriptor, whether it is in an internal report, an equal opportunity employment database, a criminal investigation, or in simply recording or relaying a witness' description.
 
 
 2
 The right to equal protection is an individual one. See Village of Willowbrook v. Olech, 120 S.Ct. 1073, 1074-75 (2000). Under Judge Straub's theory, therefore, the right not to be questioned (absent a compelling state interest and by means narrowly tailored to the pursuit of such interest), would be offended whenever the police act upon a description that includes race, regardless of whether the person questioned was the two hundredth approached by the police or the only one. Nothing in Judge Straub's opinion suggests that his rule would be limited to exclude a situation in which an officer observes a crime on the street, follows the perpetrator into an empty restaurant, and questions the only customer there who fits the race of the perpetrator he observed. In short, it is difficult to discern limits to the impediments Judge Straub's rule would place on ordinary police work.
 
 III. Judge Calabresi's Proposal
 
 3
 Judge Calabresi, although discomforted by the panel's decision that equal protection considerations are inapplicable when the police follow a victim's description that includes race, acknowledges certain difficulties with a contrary position. He correctly recognizes that under present law "[i]f an action is deemed a racial classification, it is very difficult, under the Supreme Court precedent, ever to justify it" and making such justification easier "in cases of police following a victim's description" would lead to an undesirable spillover in other racial classification contexts. See post at [12] (Calabresi, J. dissenting). "In other words, were the requirements of strict scrutiny to be relaxed in the police/victim's description area, it would be hard indeed to keep them from also being weakened in other areas in which racial classifications ought virtually never to be countenanced." Id. He concludes, therefore, that "courts should recognize severe limitations on their competence to deal with victim's racial descriptions." Id.
 
 
 4
 Unable to discern a plausible jurisprudential basis for an equal protection claim when the police follow a victim's description, Judge Calabresi proposes a variant rule that he says this case raises: strict scrutiny is triggered if the police disregard all but the racial component of the victim's description. More precisely, he states the rule as "the police created and acted upon a racial classification [that triggers strict scrutiny] by setting aside all but the racial elements in the victim's description." Id. at 6 (emphasis in original).
 
 A. In Banc Considerations
 
 5
 As noted above, Judge Calabresi's rule has neither been proposed, let alone adopted, by any court. So far as I can tell (or Judge Calabresi claims), it has never before been thought of. But more to the point in this litigation, it was at no time argued by the plaintiffs and in fact is not supported by the pleadings. As a matter of in banc policy, substantive law, and sound jurisprudence, this court has appropriately declined to reach out and embrace this new untested rule on facts that do not put it at issue.
 
 
 6
 It is well-settled in this court that "[a] conclusory allegation without evidentiary support or allegations of particularized incidents, does not state a valid claim." Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (quoting Butler v. Castro, 896 F.2d 698, 700 (2d Cir. 1990)). Judge Calabresi relies chiefly on a general allegation in the complaint that the police "attempted to stop . . . any and every non-white person in and around the City of Oneonta." Second Amended Complaint at 4; see also id. at 30 ("the objective, as defendant Chandler [the State police investigator in charge of the investigation] told the newspapers Newsday and the Oneonta Daily Star, was to try 'to examine the hands of all black people in the community.'"). Id. at 2. But these are just the sort of general, bald allegations prohibited by Kern and Butler. And the complaint has a strange way of alleging, as Judge Calabresi reads it, that the police stopped African-Americans without regard to their age and sex. Indeed, the allegation is hedged as an "attempt" and seemingly includes other "non-whites" (for example, Asians, Native Americans, Hispanics). Moreover, it is vague on precisely the subject as to which specificity from the plaintiffs would be expected: departure from the given description. In sum, no where does the complaint allege that the police actually did depart from the description given by the victim. That such a contention is absent is not surprising: it strikes me as nonsensical to believe that the police, who have been given a description of the attacker, would disregard the description and look for someone else.
 
 
 7
 Perhaps realizing the deficiency in the allegation he points to, Judge Calabresi scours the approximately one-hundred-page complaint and the record below to patch together scattered demographic references in an effort to tease out an inference that the police stopped numerous black women. His math is speculative and ends up presenting at most another insufficiently particularized allegation. See post at 8 (Calabresi, J. dissenting) Only one relevant allegation with the required specificity appears in the complaint: that the police stopped Sheryl Champen, a woman. To be sure, this one stop could have been in disregard of the victim's description of the attacker as male. But it is far more likely that the police, who after stopping her did not ask to see her hands, were initially mistaken about her sex or, because she was boarding a bus, feared losing a person with relevant information. In any event, the solitary fact that Ms. Champen was questioned cannot support the far broader claim that the police systematically strayed from the bounds of the description they were given and stopped "any and every" African-American in Oneonta.[1]
 
 
 8
 Judge Calabresi's suggestion that we instruct the district court in this case to allow the plaintiffs to submit a fourth complaint which could then allege facts that could support his proposed rule introduces a jurisprudential danger. A footnote in the panel opinion permits repleading, see Brown v. City of Oneonta, 221 F.3d 329, 339 n.9 (2d Cir. 2000), but it does so only to the extent that the district court's understanding of the law of this circuit is clarified by the panel opinion. Had this court actually adopted Judge Calabresi's new rule and directed the district court to permit repleading, and had the plaintiffs still been unable to state a case, which in my view is likely, this court would have announced a novel rule of constitutional law on a fact scenario that Judge Calabresi has simply hypothesized from a creative (and strained) reading of the complaint. As a rule of constitutional law, it would be impervious to legislative change, drifting about, untethered by any factual anchor, turning up in odd contexts, uninvited and inapt. The case and controversy requirement of Article III, both as the supreme law of the land and as wise jurisprudence, requires more than a hypothetical scenario to introduce far reaching constitutional strictures into the law.
 
 B. Criticisms
 
 9
 Putting aside the fact that Judge Calabresi's creative proposed rule is not presented in this case, in my view it is flawed and unworkable.
 
 
 10
 Judge Calabresi's opinion describes the proposed rule variously as: (i)"the police create[d] and act[ed] upon a racial classification [that triggers strict scrutiny] by setting aside all but the racial elements in the victim's description" and (ii) "[the state is] creating an express classification that can only be approved if it survives strict scrutiny when state officers (like the police) ignore essentially everything but the racial part of a victim's description, and, acting solely on that racial element, stop and question all members of that race they can get hold of, even those who grossly fail to fit the victim's description[.]" See post at [6] (Calabresi, J. dissenting) (emphasis in original).
 
 
 11
 If this proposed rule were adopted, it would mean that whenever the police are given a description that includes race, simply asking questions of a person of that same race who does not otherwise fit the description would violate that person's constitutional right to equal protection unless the state could (1) show a compelling state interest and (2) that the questioning was essential to achieving that interest.
 
 
 12
 Innocent situations that could trigger liability under Judge Calabresi's rule spring to mind. For instance, the proposed rule would apply to any situation in which the police were trying to find a fleeing suspect in a defined and limited area, such as a restaurant, a sidewalk, a parking lot, or a building, regardless of how many people occupied the area in question. In such a situation, officers often cannot know with complete certainty whether the person they question eventually might turn out to be a suspect, not least because they can never be sure of the accuracy of the victim's description, or whether the person so described has somehow subsequently altered his or her appearance, perhaps by shedding tell-tale clothing.
 
 
 13
 Judge Calabresi's rule also would apply to instances where a police officer forgets or confuses part of the description--whether the perpetrator was wearing a grey jacket or a brown one, for example. In such instances, prudent officers would fear to question anyone at all lest they draw an equal protection lawsuit. Finally, and perhaps most troubling, Judge Calabresi's proposal, were it adopted, might be used as a prophylactic device to invalidate the arrest of the actual perpetrator, if that person could successfully argue that when he was first stopped and questioned he imperfectly "fit" a victim description that included race.
 
 C. Fourth Amendment Safeguards
 
 14
 The Fourth Amendment's prohibition on unreasonable searches and seizures, carefully calibrated by the Supreme Court over two centuries, balances law enforcement needs against the rights of the citizen to be protected. See Graham v. Connor, 490 U.S. 386, 395 (1989). Three levels of interaction between the police and private citizens have developed under Fourth Amendment jurisprudence: voluntary encounters that do not require justification, so long as the police do not intimate that their requests must be heeded, see United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995); investigative detentions, so called Terry stops, that do require a justification of reasonable suspicion of criminal activity, see Terry v. Ohio, 392 U.S. 1 (1968); and finally, arrests that require a demonstration of probable cause, see Tehrani, 49 F.3d at 58. This framework, arrived at over the years through case-by-case adjudication, in the context of concrete factual settings, strikes an appropriate balance between individual rights and the necessities of effective law enforcement. See United States v. Place, 462 U.S. 696, 703 (1983).
 
 
 15
 Judge Calabresi's proposal, by injecting equal protection analysis into police investigations that rely on racial descriptors, would upset this carefully crafted balance.[2] Fearing personal liability through Section 1983, 42 U.S.C. § 1983, litigation from equal protection violations arising from their investigative activities, police officers would undoubtedly fail to act in situations where we would expect them to.
 
 
 16
 The indefensibility of accepting the social costs of chilled policing in this context becomes all the more apparent when one considers the present reach of the Fourth Amendment: the gap in constitutional protection that Judge Calabresi believes to be created by the panel opinion and that he intends his rule to remedy is a narrow one. Judge Calabresi's proposed approach would impose equal protection analysis without regard to whether the person encountered by an officer was arrested, temporarily detained for questioning or simply asked questions while remaining free to walk away.
 
 
 17
 Fourth Amendment jurisprudence - though not a general bar to racial discrimination or classification - already prohibits arrests and Terry investigatory detentions in many situations with which Judge Calabresi is concerned, that is, where "state officers (like the police) ignore essentially everything but the racial part of a victim description, and acting solely on that racial element stop and question all members of that race they can get hold of even when those questioned grossly fail to fit the victim's description." See post at [6] (Calabresi, J. dissenting). Such stops based on racial considerations alone, absent compelling exigent circumstances, would almost never rest on the constitutionally required "reasonable articulable suspicion" of criminal activity needed to justify an investigatory detention, see, e.g., U.S. v. Brignoni-Ponce, 422 U.S. 873, 885-86 (1975) (no reasonable suspicion for border agent to detain person based solely on apparent Mexican ancestry)[3], and a fortiori would never rise to the level of probable cause for a warrantless arrest. Cf. Graham v. Connor, 490 U.S. 386, 395 (1989) (applying Fourth Amendment analysis and not more generalized due process guarantee to arrests, investigatory detentions, and "other 'seizure[s]' of a free citizen...[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection" as opposed to the "more generalized notion of 'substantive due process'"). Therefore, it is only for police encounters falling short of a restraint "by means of physical force or show of authority," Terry, 392 U.S. at 19 n.16, that Judge Calabresi's proposed introduction of equal protection analysis would supply constitutional protections presently unavailable under the Fourth Amendment.
 
 
 18
 I believe that any benefits from extending equal protection guarantees to such situations, where the citizen who is questioned is not deprived of his liberty even for a brief period of time and remains free at all times to walk away from the officer, are outweighed by the additional costs to effective law enforcement.[4] Officers rely on their ability to act on non-articulable hunches, collected experience, intuition, and sense impressions--all of which are crucial in carrying out a criminal investigation. Officers would be forced to justify these intuitive considerations in order to meet an accusation that race was the sole factor motivating the encounter. The unworkability of such a regime is self-evident.
 
 
 19
 If some guidelines for officers conducting non-restraint encounters based on victim or witness descriptions, where race is a component of the description, are needed (about which I have no opinion), then they are more appropriately established by bodies with political accountability and with more experience and insight into the nuances of community policing than unelected life-tenured federal judges. State legislatures, municipal councils, and citizen oversight boards are far better suited than courts to balance the complicated considerations regarding the community's policing needs and the sensibilities of minorities who may feel unfairly targeted.
 
 
 20
 Judge Calabresi is understandably troubled by the facts of this case, as no doubt were the plaintiffs to an even greater degree. But it seems to me that his proposed new rule has missed the real source of that discomfort. It is not that the police strayed from the description they were given, if stray they did. Rather, it is that the police conducted an investigation that went through the town seeking to stop every young African-American male fitting the description the victim provided. The proper judicial remedy for people who were stopped and questioned during that investigation, as I have noted, is under the articulated and available standards of the Fourth Amendment; and several of those stopped have pursued that remedy. The constitutional rule that Judge Calabresi has fashioned, by contrast, would hamper police efforts in investigating countless individuals--investigations that bear little or no resemblance to the "sweep" that is alleged to have occurred in this case. The consequent crippling of law enforcement in the more individual contexts of daily police work would exact severe societal costs, and nowhere more so than in minority neighborhoods. The obvious presence of such costs counsels strongly against deciding to go in banc in order to elaborate ex nihilo a broad new rule of equal protection law that would constrain the police in situations that do not implicate the Fourth Amendment.
 
 
 21
 For these reasons, I concur in the court's decision to deny this petition for rehearing in banc.
 
 
 
 NOTES:
 
 
 [1]
 Judge Calabresi also thinks the police request for a list of black male students at SUCO creates an inference that they departed from the victim's description. But this fact does not support Judge Calabresi's claim that the police wanted to stop elderly matriculants as well as those supposed to be college-aged.
 
 
 [2]
 Judge Calabresi also argues that our circuit's Fourth Amendment law concerning whether a stop has occurred needs to be clarified. Judge Calabresi maintains that it is unsettled whether the reasonableness determination--that is, deciding whether a reasonable person would have felt free to leave--is a question of fact or one of law. See post at [5 n.1] (Calabresi, J. dissenting). I think the law is clear on this point. The question of whether a seizure occurred is a question of law, see Oneonta, 221 F.3d at 340; the circumstances underlying that determination are questions of fact for the jury. See id. Whether a seizure occurred is determined by asking whether a reasonable person would have felt free to leave. Because the seizure determination is a question of law, it follows a fortiori that ascertaining reasonableness is also a question of law. See United States v. Peterson, 100 F.3d 7, 11 (2d Cir. 1996) (reviewing de novo the district court's determination, before trial, that a reasonable person would have felt free to leave); United States v. Montilla, 928 F.2d 583, 588 (2d Cir. 1991) ("[W]e believe that . . . whether those statements and acts resulted in a seizure is a question of law subject to de novo review."); see also United States v. Espinosa-Guerra, 805 F.2d 1502, 1507 n.18 (11th Cir. 1986) ("[t]he trial court's determination of whether a reasonable person would have believed that he is not free to leave is a question of law" (internal quotation marks omitted)).
 The single case from our circuit that Judge Calabresi says supports the view that a reasonableness determination under the Fourth Amendment is a question of fact is inapposite. See Posr v. Doherty, 944 F.2d 91 (2d Cir. 1991). The question in Posr, in which I wrote the opinion, was not whether police action constituted a seizure, but whether an arrest had occurred. And, as Judge Calabresi notes, the question of when an investigative stop ripens into an arrest is for the finder of fact. See Tehrani, 49 F.3d at 58. Because in Posr the jury had already found that the police had used excessive force, we noted that as a practical matter the only determination left for the jury on remand was reasonableness. See Posr, 944 F.3d at 99-100. The fact that reasonableness was an issue for the jury in that case followed from its peculiar posture and from the arrest issue. The law is otherwise clear that whether a seizure has occurred--that is, whether a reasonable person would have felt free to leave--is a question of law for the court.
 
 
 [3]
 Lower courts are generally in accord that race alone will not support a Terry stop under the Fourth Amendment. See, e.g., U.S. v. Grant, 920 F.2d 376, 388 (6th Cir. 1990) (no reasonable suspicion to detain person when agents' only basis for stop was that man of color wearing dreadlocks was illegal alien from Jamaica and traveled from drug-source city); Buffkins v. City of Omaha, 922 F.2d 465, 470 (8th Cir. 1990) (no reasonable suspicion when informant's tip merely described race of person and person carried toy animal that appeared to be resewn); Orhorhaghe v. INS, 38 F.3d 488, 497 (9th Cir. 1994) (no reasonable suspicion for INS agent to seize person based solely on "Nigerian-sounding name"); U.S. v. Tapia, 912 F.2d 1367, 1371 (11th Cir. 1990) (no reasonable suspicion supported further detention of vehicle beyond citation for speeding when suspect Mexican had out-of-state license plates, appeared visibly nervous during confrontation with officers, and had few pieces of luggage").
 
 
 [4]
 I do not believe Judge Calabresi's proposed rule to be "superfluous," see post at 11 n.13 (Calabresi, J. dissenting), because of the existence of Fourth Amendment protections. To the contrary, my point is that the potential constitutional protections his unprecedented rule would afford to potential criminal suspects (who are in no way restrained but may be offended by the police encounters) would add to those that exist but would upset the Fourth Amendment's careful balance of interests and entail unacceptable costs to society.
 
 
 JACOBS, Circuit Judge, concurring:
 
 22
 I concur in the denial of in banc review, and do so by opinion in order to say why I am wholly unconvinced by the dissenting analysis advanced by Judge Calabresi and in broader strokes by Judge Straub. Opinions pro and con on the denial of rehearing belong to a deservedly neglected genre. But I consider an opinion worth doing this time because an unintended subtext of Judge Calabresi's opinion is that the panel opinion may be insufficiently deferential to large communities of Americans.
 
 
 23
 The premise of Judge Calabresi's dissenting opinion is that the complaint, fairly read, alleges that in investigating a crime the Oneonta police treated as a suspect every minority individual regardless of sex or age, in disregard of every feature of the victim's description except race. Since Judge Calabresi concedes that the police investigation was conducted without racial animus, his opinion makes the unnatural assumption that the police simply imposed on themselves a mindless burden that would only delay finding a likely suspect.
 
 
 24
 Judge Calabresi's reading of the 100-page complaint relies on an aggressive interpretation of passages juxtaposed from here and there, and conceives a claim that the plaintiffs themselves did not urge. Thus the complaint has been made to yield trace allegations deemed sufficient to justify a remand for yet another amended complaint, so that facts can be pleaded that may float Judge Calabresi's views on a sensitive and vexed social question.
 
 
 25
 Even assuming that this case presented a problem unsolved by the panel, the prescription that Judge Calabresi offers is a bad idea. Judge Calabresi's opinion says that strict scrutiny should apply when the police disregard all features of a description given by a witness or victim and search solely on the basis of race. It seems to me pointless to convene the Court in banc in order to announce such a principle, because I don't see how it would ever arise in an actual case: if, for example, the description is of a short black man with cropped hair, why would the police stop all black men, women and children, short and tall, long hair, short hair, or bald?
 
 
 26
 I notice, however, that the constitutional doctrine advanced in Judge Calabresi's opinion would (if it can support anything) support a much broader principle, namely, that when a witness or victim describes a suspect in terms that include race, any deviation by the police from the non-racial descriptive features will be deemed the making of a racial classification subject to strict scrutiny. As Judge Calabresi's opinion goes along, it speaks in these broader terms: e.g., "ignor[ing] essentially everything but the racial part of a victim's description;" "focusing . . . solely or predominantly on the fact that the perpetrator was black;" "focus[ing] almost exclusively on [] racial elements." See post at 6, 7, 8 (Calabresi, J., dissenting) (emphasis added).
 
 
 27
 In order for this Court to direct that the district court accept the present pleading or accept a further amended pleading that spells out Judge Calabresi's doctrine, we would have to hold that such a pleading states a claim for relief. I would vote against an in banc proceeding intended to advance such a doctrine for several reasons. The doctrine, as Judge Walker explains in his concurring opinion, is unworkable. And it is advanced without the inputs of briefing, precedent or scholarship, on which we have made it our habit to rely. Specifically, the doctrine is unaided by any input from the law enforcement community or from any of the other branches or organs of government. Moreover, the doctrine is based on unexamined notions now current in the bien pensant community rather than on any previously understood principles of policing or (for that matter) constitutional law, and is therefore incompletely baked. Finally, it trivializes strict scrutiny by applying it in routine circumstances in which the conduct scrutinized will be routinely validated.
 
 
 28
 If Judge Calabresi's prescription is bad, the side effects are worse. As Judge Walker points out, Judge Calabresi's rule would impose paralyzing inhibitions on law enforcement officers in minority communities. That is because fear of lawsuits, investigations and departmental discipline will tend to make the police in minority communities defensive, passive and scarce. No doubt, some people will think that is a good idea, but no community has yet elected to rely on police protection furnished by a corps of federal judges, and in any event it is presumptuous to assume that any community is of one mind on such an issue. Finally, Judge Calabresi's idea is certainly not one that a Court should casually adopt as immutable constitutional doctrine without the petition of any party to a case or controversy.
 
 
 29
 Sack and Katzmann, Circuit Judges, concurring in the denial of rehearing in banc:
 
 
 30
 We concur in the Court's decision to deny rehearing in banc because we think it would likely be unproductive. We note, however, our view that the Court should have remanded to the district court allowing the plaintiffs to amend their complaint in light of the panel's clarifying language with respect to the Equal Protection Clause in its amended opinion.
 
 
 31
 KEARSE, Circuit Judge, dissenting from the denial of rehearing en banc: I dissent.
 
 
 32
 CALABRESI, Circuit Judge, with whom Judge STRAUB joins, and with whom Judges PARKER and SOTOMAYOR join (with the exception of Part VI), dissenting from the denial of a rehearing in banc:
 
 
 33
 The panel opinion, Brown v. Oneonta, 221 F.3d 329 (2nd Cir. 2000), fails adequately to deal with a fundamental issue raised by the plaintiffs' allegations. It does so in contravention of established precedents of the Supreme Court of the United States and of our court. Because of this failure, the panel is led, unnecessarily I think, to express views on a topic that is both complex and divisive. All this occurs in a context - police investigations in which race is a factor - that implicates some of the deepest and most searing questions in our society. I believe that review of the panel's opinion is essential, and hence respectfully dissent from the denial of a rehearing in banc.
 
 
 34
 * The facts in this case speak for themselves. They can be stated simply and are taken, for the most part, from the panel opinion.
 
 
 35
 Oneonta, a small town in upstate New York about sixty miles west of Albany, has about 10,000 full-time residents. In addition, some 7,500 students attend and reside at the State University of New York College at Oneonta ("SUCO"). The people in Oneonta are for the most part white. Fewer than three hundred blacks live in the town, and just two percent of [approximately 150 out of 7,500] students at SUCO are black.
 
 
 36
 On September 4, 1992, shortly before 2:00 a.m., someone broke into a house just outside Oneonta and attacked a seventy-seven-year-old woman. The woman told the police who responded to the scene that she could not identify her assailant's face, but that he was wielding a knife; that he was a black man, based on her view of his hand and forearm; and that he was young, because of the speed with which he crossed her room. She also told the police that, as they struggled, the suspect had cut himself on the hand with the knife. A police canine unit tracked the assailant's scent from the scene of the crime toward the SUCO campus, but lost the trail after several hundred yards.
 
 
 37
 The police immediately contacted SUCO and requested a list of its black male students. An official at SUCO supplied the list, and the police attempted to locate and question every black male student at SUCO. This endeavor produced no suspects. Then, over the next several days, the police conducted a "sweep" of Oneonta, stopping and questioning non-white persons on the streets and inspecting their hands for cuts. More than two hundred persons were questioned during that period, but no suspect was apprehended. Those persons whose names appeared on the SUCO list and those who were approached and questioned by the police, believing that they had been unlawfully singled out because of their race, decided to seek redress.
 
 
 38
 Id. at 334.
 
 
 39
 As the opinion goes on to note, despite the description given by the victim, "at least one woman, Sheryl Champen, was [allegedly] stopped by law enforcement officials during their sweep of Oneonta." Id. at 338. In addition, though the panel does not mention it, the plaintiffs also alleged that:
 
 
 40
 During the "sweep," which occurred over a five day period, the officials, without any basis for suspecting any individual approached except for his or her race, attempted to stop, question, and physically inspect the hands of any and every non-white person in and around the City of Oneonta. Second Amended Complaint, at page 4, lines 1-5.
 
 
 41
 Also not mentioned by the panel is that the breadth of the sweep allegedly was no accident. For, as is further asserted by the plaintiffs, "the objective, as defendant Chandler [the State Police Investigator in charge of the probe] told the newspapers Newsday and the Oneonta Daily Star, was to try 'to examine the hands of all the black people in the community.'" Second Amended Complaint, at page 30, ¶ 100.
 
 
 42
 In other words, according to the plaintiffs' allegations, on the basis of a victim's statement that her assailant was a young black male, the police in Oneonta, instructed by Chandler, decided to stop and question (a) every male black student at SUCO, regardless of age; (b) every non-white person they could find in the City of Oneonta, regardless of age or sex; and (c) at least one black woman named Sheryl Champen, who has joined this suit as a plaintiff.
 
 
 43
 Because the district court dismissed the plaintiffs' complaint on a 12(b)(6) motion, all of these facts, and any others that may be shown in support of the allegations, must be taken as true, Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 138 (2d Cir.1999), unless they are fanciful or delusionary, or, if instead of facts, they represent only legal conclusions. See Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998) ("[B]ald assertions and conclusions of law are insufficient" to survive dismissal.); cf. Contemporary Mission, Inc. v. United States Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (permitting summary judgment if the plaintiff adduced only facts that were "fanciful, frivolous, gauzy, spurious, irrelevant. . . .").
 
 II
 
 44
 The plaintiffs brought suit claiming that the defendants' behavior contravened the Equal Protection Clause of the United States Constitution.[1] The district court thereupon granted a 12(b)(6) motion to dismiss. But, as the panel acknowledges, it did so on an erroneous theory. The lower court believed, incorrectly, that in order to state an equal protection claim plaintiffs were required " . . . to plead the existence of a similarly situated group of non-minority individuals that were treated differently in the investigation of a crime."[2] Accordingly, after giving plaintiffs an opportunity to amend their pleadings to make such an allegation (which plaintiffs were unable to do), it dismissed their amended complaint.
 
 
 45
 As the panel properly notes, however,
 
 
 46
 There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause. A plaintiff could point to a law or policy that "expressly classifies persons on the basis of race." [Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999)] (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213, 227-29 (1955)). Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. See Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886). A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus. See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); Johnson v. Wing, 178 F.3d 611, 615 (2d Cir. 1999).
 
 
 47
 221 F.3d at 337. And, as the panel also says, plaintiffs are therefore correct "that it is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification. These classifications are subject to strict judicial scrutiny, see Able v. United States, 155 F.3d 628, 631-32 (2d Cir. 1998)." Id.
 
 
 48
 Accordingly, the issue before the panel was: Did the plaintiffs adequately plead that state officials imposed a constitutionally suspect classification? It is this question that the panel, in my view, fails adequately to answer. For, instead of considering, on the facts that we must take as true, whether the police created and acted upon a racial classification by setting aside all but the racial elements in the victim's description, the panel examines the purely hypothetical question of whether, had the police acted on the victim's description, such behavior would have imposed a racial classification. See id.
 
 
 49
 It follows that the panel's answer to this question is irrelevant to deciding the controversy actually before us. That controversy, not addressed to any significant degree by the panel, remains the following: Is the state creating an express racial classification that can only be approved if it survives strict scrutiny when state officers (like the police) ignore essentially everything but the racial part of a victim's description, and, acting solely on that racial element, stop and question all members of that race they can get hold of, even those who grossly fail to fit the victim's description? The answer to that question, all but ignored by the panel, seems to me - both on the precedents and on plain logic - to be a resounding yes.[3] See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 235 (1995) ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); Saenz v. Roe, 526 U.S. 489, 505 (1999) (holding that where the right "to be treated equally" is at stake, "discriminatory classification is itself a penalty"); see also Hayden, 180 F.3d at 48; Able, 155 F.3d at 631-32.
 
 
 50
 If I am correct, then the only way in which it can be said that plaintiffs have not sufficiently pleaded a violation of the equal protection of laws is if they have failed to allege facts that, if proven, would show that the police of Oneonta discounted the non-racial elements in the victim's description while focusing, instead, solely or predominantly on the fact that the perpetrator was black. It is, therefore, to the adequacy of the plaintiffs' pleadings - again virtually unexamined by the panel opinion - to which I turn.
 
 III
 
 51
 That the facts pleaded are adequate seems to me manifest. In addition to the allegation - acknowledged by the panel - that the police stopped at least one woman, the Second Amended Complaint states at page 4, lines 1-5:
 
 
 52
 During the "sweep," which occurred over a five day period, the officials, without any basis for suspecting any individual approached except for his or her race, attempted to stop, question, and physically inspect the hands of any and every non-white person in and around the City of Oneonta.
 
 
 53
 And as the complaint says at page 30, ¶ 100, the objective of the sweep as described by the head state police investigator was "'to examine the hands of all the black people in the community.'"
 
 
 54
 Furthermore, the Second Amended Complaint, on page 3, alleges that the "defendants law enforcement officials . . . obtained . . . a list containing the name . . . of all the male African-American students of SUCO [and] then sought out, approached, questioned, seized, and/or searched every person on that list." Like the prior allegations, this assertion forms a proper basis for proving that the defendants ignored the victim's description and focused almost exclusively on its racial elements. (This will be so if plaintiffs demonstrate - what may well be the case - that some African-American students at SUCO, a state college after all, were not young.) If words mean anything, these statements in the pleading, which are unequivocal and non-conclusory, support precisely the claim that the police went beyond the victim's description and created their own racial classification.[4] The complaint, moreover, nowhere contradicts any of the foregoing factual assertions
 
 
 55
 The only way, therefore, that the plaintiffs' allegations could be deemed inadequate would be if these pleadings, these facts, could be termed "bald" or "fanciful." That they are neither is, however, demonstrated by the panel's own account, ". . . the police conducted a 'sweep' of Oneonta, stopping and questioning non-white persons on the streets and inspecting their hands for cuts. More than two hundred persons were questioned during that period, but no suspect was apprehended" [while] "[f]ewer than three hundred blacks live in the town."
 
 
 56
 Since it is extremely unlikely that out of "fewer than three hundred blacks" (apart from black SUCO students who had already been questioned), more than two hundred were young males, it is anything but fanciful or bald to suggest, as the complaint expressly claims, that the police questioned virtually all blacks they could find, and intentionally did so regardless of age and sex. Let me be clear: I am not saying that the complaint alleges this demographic data. It doesn't need to. It alleges facts as to police behavior that, if proven, support a finding that the police went beyond the victim's description and created their own racial category. That is enough to get by 12(b)(6),[5] unless the factual allegations are so fanciful that the court can ignore them. What the conceded demographic data do is to make clear beyond peradventure that the plaintiffs' assertions, far from being unlikely or fanciful, may well be true.
 
 IV
 
 57
 How, then, can it be that allegations adequate to mandate the denial of a 12(b)(6) motion were deemed to be lacking? The only possibility that comes to mind is plainly wrong. The plaintiffs did not assert the specific legal theory on the basis of which the facts alleged would, if proven, constitute a violation of equal protection law (unless defendants' actions survived strict scrutiny). That is, the plaintiffs did not articulate the following legal conclusion: "The facts alleged show that the police went beyond the victim's description and therefore created a racial classification." But, as is universally recognized, plaintiffs are required to plead facts not legal theories. It follows that a statement of a specific legal theory is in no way needed for a pleading to survive a 12(b)(6) dismissal motion. See Simonton v. Runyon, No. 99-6180, 232 F.3d 33, 36 (2d Cir. Aug. 22, 2000) (citing Marbury Mgt., Inc. v. Kohn, 629 F.2d 705, 711 n.4 (2d Cir. 1980). As a result, the plaintiffs' failure to articulate the precisely correct theory cannot justify the panel's reaching out to propound its view of what the law would be if (contrary to the facts that must be taken as true) the police had followed the victim's description.
 
 
 58
 The failure of the plaintiffs to articulate the race classification theory, however, does raise the possibility that, were we to go in banc, the plaintiffs might disavow that theory, and the in banc would then collapse. This failure, while it does not make the panel decision less egregious, could, for this reason, perhaps form the basis for a decision not to rehear that opinion in banc. But if this were the ground for declining to correct the panel's errors in banc, it would become essential to remand the case to the district court, so that the plaintiffs could clarify their position by amending their complaint. Such a remand would, of course, make totally unnecessary any legal pronouncements on what the law would be if the police had followed the victim's description.
 
 
 59
 This approach would have several advantages, apart from obviating the need for this dissent. First, it would demand of the plaintiffs that they make clear the link between the facts they alleged and the above mentioned legal theory (which is the one most proximately supported by these facts). This would helpfully tie the facts to the theory without risking the possibility of a misfired in banc. And second, it would recognize that (even on the contrary-to-fact assumption that the plaintiffs' original pleadings were inadequate to support their equal protection claim) the plaintiffs nonetheless deserve an opportunity to make their pleadings good.
 
 
 60
 On our precedents, plaintiffs are regularly and properly given at least one chance to amend their complaint in response to a district court's finding of inadequacy. See Branum v. Clark, 927 F.2d 698, 705 (2d Cir.1991) (court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated); Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); Tarshis v. Riese Org., 211 F.3d 30, 39 (2d Cir. 2000) (citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163,167-69 (1993)) (stating "the policy of liberally construing civil rights complaints"); Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).
 
 
 61
 Here the plaintiffs were seemingly offered such an opportunity. But the "chance" that they were given was in fact totally useless. The district court said to the plaintiffs, "Amend to allege that others like situated were treated differently." It did not say, "Your allegations are insufficient to support a finding that the police ignored large parts of the victim's description and in doing so created a racial classification. Amend to allege facts that, if proven, would show this." The district court was not, of course, under any obligation to point plaintiffs in the direction they needed to go. But it should not have told them both to go in the wrong direction and that this was the only direction available.[6] It follows that, even if the facts pleaded were deemed insufficient to assert a racial classification, the plaintiffs were owed the opportunity to assert additional facts that, if proven, would be sufficient.
 
 
 62
 Nevertheless, the panel declined to require that such an opportunity to replead be given.[7] All the panel did was to allow the district court to consider permitting repleading. (See, footnote 9 of the panel opinion which states, "To the extent that this opinion clarifies equal protection law, the district court is free on remand to entertain a motion to replead. We express no opinion on the merits of any such motion.") I will have more to say about the, not insignificant, effect of that footnote in a later part of this dissent. At the moment, however, it is enough to state that the failure to require that the plaintiffs be allowed to make a further amendment constitutes a serious deviation from correct practice that, by itself, would justify a rehearing in banc.
 
 V
 
 63
 More broadly, two fundamental problems with the panel's opinion justify in banc review. First, the panel errs in avoiding the critical issue that the plaintiffs' factual allegations have raised - the creation in this case of a racial classification as a result of police deviation from the victim's description. Second, that deficiency is compounded by the panel's reaching out to decide the highly divisive, and, it seems to me, unripe, question of whether and when following a victim's description is acceptable. Converting what would otherwise be dicta into what sounds like a statement of law is almost always undesirable. In the circumstances before us, it is especially unfortunate.
 
 
 64
 Why is this so? The first reason is that by doing this, the panel prematurely legitimates actions that - even if they might ultimately be deemed valid - are, as the panel itself recognized, extremely offensive to a much abused part of our population. See 221 F.3d at 339. However many heartfelt apologies the panel makes for doing so, this cannot help but hurt. If, as the plaintiffs alleged, the police did not merely follow the victim's description in questioning every male black student and two thirds of all of the black residents of the City of Oneonta, I should have thought it wise for the court to welcome the opportunity these allegations gave it to avoid having to tell African Americans that we are sorry, but you just have to put up with racially linked sweeps when victims - perhaps influenced by their own racial fears, or by our country's long history of racial divisions - give an essentially racial description.[8]
 
 
 65
 But there are also other, structural, reasons why the panel's, to me unnecessary, validation of the police sweep is particularly undesirable. The question of when, if ever, merely following a victim's description that is predominantly racial might violate equal protection norms is an extremely difficult one. A couple of examples will suggest why. Suppose an armed robbery occurs in which the victim cuts the arm of the robber. The robber, described by the victim in racial terms, runs into a crowded bar where there are only three others who could be so described. Is it wrong for the police to ask the four to show whether they have a cut on their arm? Of course not. But imagine, instead, that a passer-by sees someone illegally swimming naked in a park pond and describes the swimmer to the police in racial terms, adding that the swimmer can readily be identified because he has a distinctive tatoo on his posterior. Can it possibly be acceptable for the police to ask every male in town who fits that racial description to strip, even if the police do so with utmost politeness and in full conformity with Fourth Amendment strictures? I would certainly think not.
 
 
 66
 In between these examples there are any number of permutations involving, among other things, (a) the seriousness of the crime; (b) the number of people in the racially defined group who are subject to questioning; (c) the significance and extent of non-racial attributes given by the victim in addition to the racial one; (d) the capacity of the victim to describe the perpetrator in non-racial (as well as in racial) terms; (e) the effort, if any, by the police to elicit from the victim such non-racial descriptions; (f) the intrusiveness of the questioning; and (g) the special indignity (arising from the existence of stereotypes) that may result from connecting those in a given racial group with a particular type of crime.
 
 
 67
 Given the complexity of this issue, courts should surely avoid premature judicial pronouncements of validity (or invalidity).[9] In this respect, the revised panel opinion is an enormous improvement over the previous panel decision, Brown v. City of Oneonta, 195 F.3d 111 (2d Cir. 1999), now happily vacated. Whereas the earlier version seemed to say that any kind of police behavior that followed a victim's description was valid (unless expressly motivated by racial animus), the revised opinion seeks simply to approve police actions in this specific case. (It does so, of course, by improperly assuming that the police actually followed the victim's description.) The fact that the crime here was a serious one, and that the victim's description was not solely racial, makes the court's statement, though still unnecessary, less harmful. But harmful it remains.
 
 VI[10]
 
 68
 Determining where, if anywhere, a court should draw the line between acceptable and unacceptable police behavior in such a morass would be very hard, even in the best of circumstances. It is made yet more difficult by the fact that the legal categories courts currently have available are utterly unsuited to the task. We can leave to one side the properly forbidden instances of behavior motivated by racial animus, because we can assume that at least in most cases the police would be able to point out that their object was to catch the perpetrator and not to discriminate. Similarly, the question of whether the same action would have been taken if the racial description had been of a member of a more favored "racial" group, will (as the panel opinion demonstrates all too well) rarely be helpful in drawing appropriate lines. And so we are left only with the possibility that, perhaps sometimes, following a victim's racial description can, without more, constitute a racial classification, and as such might be subject to strict scrutiny. But that possibility also turns out to be of little help.
 
 
 69
 The problem is that the strict scrutiny criteria developed by the Supreme Court are much too blunt. If an action is deemed a racial classification, it is very difficult, under the Supreme Court precedents, ever to justify it. And, were such justification made easier in cases of police following a victim's description, the spillover to other racial classification contexts would be highly undesirable. In other words, were the requirements of strict scrutiny to be relaxed in the police/victim's description area, it would be hard indeed to keep them from also being weakened in other areas in which racial classifications ought virtually never to be countenanced. If, instead, following victim racial descriptions by the police were not deemed to be, at least potentially, racial classifications, there would be no constitutional impediment on police sweeps to identify, say, even the racially described naked swimmer.
 
 
 70
 For these, and other similar reasons, courts should recognize severe limitations on their competence to deal with victim racial descriptions. But limitations do not mean impotence, they mean that courts ought to be reluctant to act alone. Rather, courts should encourage legislatures to develop guidelines for this area. Such legislative guidelines could make nuanced distinctions between what is needed and acceptable police behavior, and what is not.[11] Courts could then both enforce those guidelines, and if a jurisdiction made distinctions that were inadequately sensitive, perhaps even strike some of them down.
 
 
 71
 My point is simply this: If courts give a blank check and broadly legitimate police behavior when it consists of blindly following victims' descriptions that are predominantly racial, legislatures are very unlikely to step in. If, instead, courts try to define, on their own, what is acceptable and what is not, they will probably botch the job terribly. Neither approach is as likely to be as good as one that would derive from a dialogue that could be developed between courts and legislatures.[12]
 
 
 72
 By speaking at all when it did not need to, the panel both makes legislative intervention less likely and guides that intervention - were it to occur - prematurely and hence improperly. How much better it would have been, therefore, had the panel taken note of the fact that the plaintiffs' allegations made this case one in which the police did not merely follow a victim's description, but instead created their own racial category. The panel would then have reversed the district court while, at the same time, pointing out the difficulties that courts face with respect to situations in which the police do no more than follow victims' descriptions. Had it done this, the panel would not only have not needed to tell African Americans that, sorry as we are, you must put up with demeaning treatment, it would also have furthered a legislative/judicial dialogue that, precisely because it would involve participation by, among others, African Americans and the police, would have some hope of developing effective and non-hurtful ways of dealing with a very hard problem.[13]
 
 VII
 
 73
 Blessedly,[14] this case is far from over. In footnote 9, the panel opinion invites the district court to consider allowing repleading. If the proverbial wink in fact turns out to be as good as a nod, the district court will permit a new amended complaint (as I believe it must do). That revised complaint could tie the facts alleged to the specific theory that an equal protection violation here occurred because the police created their own racial classification by deviating in an impermissible way from the victim's description.
 
 
 74
 It might then happen, if plaintiffs are able to support the facts they allege sufficiently to avoid summary judgment, that the case would proceed to trial. The result of such a trial could be that - except for its uncontroversial recognition that a prima facie violation of the Equal Protection of the law that is subject to strict scrutiny occurs when a racial classification is created by state action - everything the panel said would be of little significance. And the panel opinion would end up being no more than a minor footnote to a case decided on other grounds.[15]
 
 CONCLUSION
 
 75
 It may be, therefore, that our failure to go in banc will ultimately not have seriousconsequences; 'tis a consummation devoutly to be wish'd. At the moment, however, we are faced with a panel opinion that, (a) though less bad than its prior version, now happily vacated, still makes unnecessary, and inevitably hurtful, remarks about when following victims' descriptions involving race is constitutionally permissible; (b) does this by ignoring pleadings that are manifestly sufficient under our 12(b)(6) jurisprudence; and (c) additionally, does it by refusing to require the district court to permit further pleadings despite the fact that earlier repleadings were in response to an incorrect statement of the law by the district court. These errors, moreover, are egregious, and are made in a case that directly involves issues that most searingly divide our society. When such issues are incorrectly dealt with by a panel of our court, an in banc rehearing is, to my way of thinking, not only justified but essential. For that reason, I respectfully dissent from the denial of in banc review.
 
 
 
 NOTES:
 
 
 [1]
 Some of the plaintiffs also alleged violations of the Fourth Amendment. I believe that the panel opinion's handling of the Fourth Amendment claims of Jamel Champen and Ricky Brown is in direct conflict with the law of two circuits, see Gardenhire v. Schubert, 205 F.3d 303, 314 (6th Cir. 2000); McGann v. Northeast Ill. Reg. Commuter R.R., 8 F.3d 1174, 1186 (7th Cir. 1993), and highlights an apparent conflict within our own circuit.
 The issue raised by these cases concerns when a court and when a fact-finder should determine whether a reasonable person would conclude that he or she was free to leave while being questioned by the police. In United States v. Montilla, 928 F.2d 583, 588 (2d Cir. 1991), we indicated that "freedom to leave" was generally a legal question to be decided by a court. In Posr v. Doherty, 944 F.2d 91, 99-100 (2d Cir. 1991), we suggested, instead, that it was usually a fact issue for the jury. The revised panel opinion says that, actually, the question is a mixed one of law and fact. See 221 F.3d at 340 ("Whether a seizure occurred is a question of law to be reviewed de novo, while the factual findings underlying that determination are reviewed for clear error."). Fair enough. But that statement does not explain whether the reasonableness of a questioned person's belief as to his or her freedom to leave is one of the underlying factual findings or is, instead, part of the legal conclusion.
 In an earlier, now vacated, opinion the current panel treated "reasonableness" as part of the legal conclusion, and found against the plaintiffs. In the present opinion, the panel still treats it as "law," but finds for the plaintiffs. The new result may be more nearly correct on the facts but it may well be wrong on who is the proper decision maker. Treating reasonableness as a legal conclusion is not only in conflict with decisions of other circuits (see supra) but is also inconsistent with much other closely related law. See, e.g., United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995) (the "point [at which] a permissible investigative detention ripens into an arrest is a question of fact"); Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999) ("[a] jury could reasonably conclude" that a person of reasonable caution would have believed that the seizure at issue was not justified), cert. denied, 120 S.Ct. 1832 (2000)); see also DeMarco v. Sadiker, 952 F. Supp. 134, 140 (E.D.N.Y. 1996) (relying on Posr in a different, but not unrelated, situation).
 At the very least, greater clarity on this point, both in terms of our circuit's own law and in terms of our law's relation to that of other circuits is sorely needed.
 
 
 [2]
 It is not surprising that the district court erred in this way, given the fact that the parties had not argued the theory of the case that I discuss below.
 
 
 [3]
 I do not, of course, mean to suggest that any seeming police deviation from a victim's description constitutes the creation of a racial classification. If the police question those people in a racially defined group who range from, say, 5'10" to 6'2", on the basis of a victim's description of a 6' tall man "of that race," such behavior could hardly be termed a deviation. And, there is no reason for the police to be tied to elements in a victim's description that are readily alterable within the relevant time frame. Thus if the description includes a red bandana, which can quickly be ditched, it would be absurd to limit the police's questioning to those with red bandanas. Other attributes (trousers, facial hair, even color of hair) are also readily alterable, but only if the time period is long enough. As a result, whether the police focused on the racial elements in the victim's description and ignored the others, thereby creating a racial classification, frequently will depend on the time period and circumstances involved.
 Similarly, and more important, even seemingly permanent attributes can be disguised. And if there were evidence that the perpetrator had (or was likely to) disguise his sex, or age, these attributes could also be discounted by the police. But "race" too can be disguised. Thus, unless the police are operating on the basis of stereotypes, or unless there is actual evidence to the contrary, there is little reason for the police to assume that the perpetrator disguised his or her gender or age, rather than race, and as a result, proceed to question only those who fit the racial description.
 In any event, no such issues are plausibly before us in this case. And, even if they were, it would be extremely unlikely that they would justify a 12(b)(6) dismissal since the reasons justifying the deviation would generally be best examined on the basis of affidavits or other factual submissions.
 
 
 [4]
 See McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246 (1980); Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (holding that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief") (emphasis added); Charles W. v. Maul, 214 F.3d 350, 357 (2d Cir. 2000) (citing Conley).
 
 
 [5]
 I am not, of course, assuming that the facts alleged will turn out to be sufficient to convince a jury, or even to avoid summary judgment. But they are more than enough to survive dismissal on 12(b)(6).
 
 
 [6]
 Again, what the district court did was quite understandable. See supra note 2.
 
 
 [7]
 Contrast, in this respect, the concurring opinion of Judges Sack and Katzmann.
 
 
 [8]
 There can be little doubt that what descriptions are given, among many possible ones, reflect a country's underlying biases. Thus in Italy after the Fascist racial laws were passed in 1938, people, for the first time, came to be described in all sorts of police situations as "Jewish looking." Similarly, at the time of the Palsgraf case, Palsgraf v. Long Island R.R. Co., 162 N.E. 99 (N.Y. 1928), police stated that some of the parties involved were "probably Italians." "Bomb Blast Injures 13 in Station Crowd," N.Y. Times, Aug. 25, 1924. Today, we don't generally describe people that way. But we do say "black," "Hispanic," etc. That this is so does not necessarily mean courts can forbid the police from acting on such descriptions. It should make us reluctant, however, prematurely to approve of such actions.
 
 
 [9]
 I would argue, just on the basis of what it told the district court in footnote 9, that the panel was obligated to avoid making these pronouncements. The footnote makes it possible that the case before us will ultimately be concluded without regard to any rules dealing with police behavior that merely follows victims' descriptions. This being so, there was no need in the current appeal to make any pronouncements on that issue. This is especially true since the pronouncements involve constitutional questions that, under our precepts, courts are to avoid deciding unless it is necessary to do so. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988); Horne v. Coughlin, 191 F.3d 244, 246 (2d Cir. 1999).
 
 
 [10]
 Judges Parker and Sotomayor, while joining all the other parts of the opinion, do not join this section.
 
 
 [11]
 Legislatures could, for example, if they deemed it appropriate, require the police to request that a victim or witness, who had given a solely racial description, answer questions seeking to elicit significant non-racial attributes of the perpetrator. Defining such detailed requirements - Miranda, to the contrary notwithstanding - is not generally something courts do well, but it fits squarely within the competence of legislatures.
 
 
 [12]
 For these purposes, when I say legislatures I presuppose involvement of the relevant executives as well.
 
 
 [13]
 In answer to all this, Chief Judge Walker and Judge Jacobs seek to make four points. I believe that all of them are incorrect.
 They first suggest that the Fourth Amendment is sufficient to protect citizens from discriminatory police behavior and, hence, that applying any equal protection review to police investigations is superfluous. Relatedly, they claim that even highly limited equal protection review would have dire consequences. But any argument that the Fourth Amendment could possibly suffice depends, I think, on two propositions, never mentioned, let alone accepted, in the concurring opinions: that where there is a seizure (like a Terry stop) one of the things that must influence whether that seizure is reasonable under the Fourth Amendment is the presence or absence of racial considerations with respect to the seizure; and further, that such a determination of reasonableness in cases of racial classification is at least open to the application of strict scrutiny criteria akin to those of equal protection. Unfortunately, these assumptions appear to be precluded by the Supreme Court's decision in Whren v. United States, 517 U.S. 806 (1996), which not only makes the motive of the officers involved irrelevant but suggests that the Equal Protection Clause and not the Fourth Amendment is the appropriate basis for objection when seizures "based on considerations such as race" occur. Id. at 813.
 In any event, even with these assumptions, the Fourth Amendment seems to me manifestly inadequate to deal with the underlying problem. There are, for example, in a society with deep racial divisions, any number of police intrusions on citizens that do not amount to Terry stops or to other forms of searches and seizures cognizable under the Fourth Amendment, but that are, nonetheless, immensely hurtful. Some of these may be necessary in order to control serious crimes. Other intrusions, however, because they are not needed to apprehend the perpetrators of such crimes, or because they deal only with trivial violations, cannot be countenanced under our Constitution. See supra at 781-82 n.3, 785-86. And yet, because no searches or seizures are involved, the Fourth Amendment cannot preclude them. As a result, excluding even a minimal consideration of equal protection when reviewing police behavior in such cases, far from protecting society from dire consequences, treats every conceivable interest of law and order, however insignificant, as if it were necessarily more important than any interest in not being categorized on the basis of race. And that seems to me clearly untenable.
 Second, they state that the police in this case could not possibly have ignored all but the racial elements in the victim's description because to do so would have been stupid. But that is precisely what the plaintiffs alleged in their complaint (and adduced evidence to support). And - quite apart from the fact that racial stereotyping leading to blatantly stupid behavior is far from unknown in our society, even, I expect, among the police - for the concurrers to disbelieve these allegations is to violate the most elementary rules of decision with respect to 12(b)(6) dismissals.
 Third, Chief Judge Walker and Judge Jacobs claim that the equal protection theory discussed in this opinion is both unheard of and academic. But, in fact, as we all know, the suspect nature of racial classifications is thoroughly grounded in the Supreme Court's and in this court's precedents. See, e.g., Whren, 517 U.S. at 813 ("[T]he constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment."). Moreover, the application of racial classification jurisprudence to the particular facts of this case can be found fully in what was argued to us, most cogently in the amicus brief in support of the plaintiffs. See Memorandum of Amici NAACP Legal Defense & Educational Fund, Inc., New York Civil Liberties Union, and Center for Constitutional Rights in Support of Petition for Rehearing with Rehearing En Banc. Since it is conceded that theories do not have to be stated in the complaint, and - given that the facts alleged may, if proven, demonstrate a violation of equal protection under the theory presented by amici - it seems clear that that theory should, at least, be considered by the district court at the 12(b)(6) stage.
 Finally, the concurrers assert that a racial classification is not necessarily created every time the police question someone who does not fit the victim's description of the perpetrator. After all, the police may only be searching for witnesses and not suspects. Of course. But one must also ask why, in the case before us - according to the allegations that we are required to take as true - all of these so-called witnesses were black, and all were asked to show whether they had the incriminating cut on their wrist. !
 
 
 [14]
 In this respect, I note that a majority of the twelve currently active judges of our court do not wish this case to be treated as ended. Five judges (Judges Kearse, Parker, Straub, Sotomayor, in addition to me) have voted in favor of a rehearing in banc, and two judges (Judges Sack and Katzmann), while voting against a rehearing in banc, have stated unequivocally that they believe the district court should permit the plaintiffs to amend their complaint. See opinion of Judges Sack and Katzmann concurring in the denial of the rehearing in banc, ante at 779.
 
 
 [15]
 See note 7 supra.
 
 
 
 76
 STRAUB, Circuit Judge, with whom CALABRESI, Circuit Judge, joins, dissenting from the denial of rehearing in banc:
 
 
 77
 I respectfully dissent from the denial of rehearing in banc. This case presents "exceptional[ly] importan[t]" questions of constitutional law, Fed. R. App. P. 35(a)(2), concerning the manner in and degree to which police investigations that rely upon predominantly racial descriptions given by witnesses are to be scrutinized under the Fourteenth Amendment and the Ku Klux Act of 1871, 17 Stat. 13 (codified at 42 U.S.C. § 1983). The panel reaches a grave conclusion by holding that the police act constitutionally under the Fourteenth Amendment when, based on a witness's predominantly racial description, they stop every young African American male in town to determine whether he can exclude himself from a vague class of potential suspects that has been defined in overwhelmingly racial terms.[1] Even counsel for the defendant-appellees-who won this appeal before the panel-seems to agree. See Bob Herbert, Breathing While Black, N.Y. TIMES, Nov. 4, 1999, at A29 (quoting statement by Attorney General of the State of New York that "[w]e won the case, but it makes your skin crawl") (cited in Plaintiffs-Appellants' Second Petition for Rehearing with Rehearing En Banc at 11). Regardless of whether one agrees with the panel's apparent reading of the complaint or Judge Calabresi's rather different view, the legal questions presented by this case remain exceptionally important, and the panel's conclusion remains quite severe. Indeed, as Judge Calabresi correctly notes, the panel's reading of the complaint actually requires it to tackle a constitutional question even more complex (and perhaps, therefore, even more worthy of in banc review) than otherwise would have been necessary concerning the manner in which police classifications that rely faithfully upon the descriptions of witnesses are to be reviewed under the Equal Protection Clause. See ante at 785 (Calabresi, J., dissenting).
 
 
 78
 It is far from self-evident that the panel's summary disposition of that novel and complex constitutional question is correct. Regardless of the source of their descriptions of suspects, police departments and individual police officers acting under color of law have an independent constitutional obligation to ensure that their use of those descriptions comports with the requirements of the Fourteenth Amendment-even if the description they rely upon is faithful to what they have been told by a witness. After all, criminal investigations are conducted by the police, not by witnesses. The witness's description in this case was given to the police as part of its process-"governmental in character," Edmondson v. Leesville Concrete Co., Inc., 500 U.S. 614, 621 22 (1991), and conducted under color of law[2] -of searching for criminal suspects. The racial classification that the witness's description is alleged to embody could only become actionable under the Fourteenth Amendment on account of the police actually using it, which the plaintiffs allege that they did.
 
 
 79
 Contrary to the suggestion of Chief Judge Walker, see ante at 773 (Walker, C.J., concurring), the recitation of that basic proposition in this opinion does not "propose" any rule beyond that which the panel itself suggests in its amended opinion-or at least beyond one of the two contradictory rules the panel suggests. The panel already has conceded, in its amended opinion, that police officers cannot wholly insulate themselves from equal protection review simply by claiming that the description they used in an investigation came, in the first instance, from a witness. See Brown v. Oneonta, 221 F.3d 329, 339 (2d Cir. 2000) (suggesting that there may be circumstances in which the police, "when acting on a description of a suspect, violate the equal protection rights of non-suspects, whether or not the police only stop persons conforming to the description of the suspect given by the victim"). With that proposition I fully agree, and in this opinion I do not suggest, much less "propose," anything more. That statement by the panel, however, contradicts a second proposition implicit in the panel's original opinion, see Brown v. Oneonta, 195 F.3d 111, 119 (2d Cir. 1999), and now made explicit in its amended opinion: that because the description "originated not with the state but with the victim," Oneonta, 221 F.3d at 338, no race-based state action took place at all in this case. Notwithstanding this dicta in the amended panel opinion, however, the initial source of the police's description of a suspect bears no constitutional significance. It simply is not relevant, one way or another, to the question of whether state action takes place when the police act upon that description, and the panel's disposition cannot plausibly rest on that basis. Cf. Palmore v. Sidoti, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").
 
 
 80
 With no support for its suggestion that no state action took place, the panel is left to rely solely on the assertion that the police interrogations of the plaintiffs in this case involved no racial classification at all. See ante at 772 (Walker, C.J., concurring). The panel reaches that conclusion by noting that the plaintiffs "were not questioned solely on the basis of their race," but based on a description that contained "also gender and age, as well as the possibility of a cut on the hand." Oneonta, 221 F.3d at 337 (emphasis added). That proposition may appear to be more plausible than the panel's suggestion concerning the presence or absence of state action, but still is not self-evidently correct. The fact that a predominantly racial description given by a witness includes other descriptors does not, by itself, make the description "race-neutral." To be sure, as Judge Calabresi correctly notes, determining whether a witness's predominantly racial description should be deemed to embody an "express" racial classification or a "race-neutral" classification is extremely difficult, and for that reason, the panel should have made an effort to avoid that constitutional question. See ante at 785-86 (Calabresi, J., dissenting); Lyng v. Northwest Indian Cemetery Protection Ass'n, 485 U.S. 439, 445 (1988); Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346 48 (1936) (Brandeis, J., concurring). The panel, however, treats it as no question at all. Clearly, the panel relied upon some criteria to determine that the presence of other descriptors (age, sex, and the "possibility of a cut on the hand") was sufficient to render the witness's description-though predominantly racial-"race-neutral." What those criteria are, however, is anybody's guess. Again, contrary to Chief Judge Walker's intimation, see ante at 772 (Walker, C.J., concurring), I do not "propose" any rule suggesting what those criteria should be. Insofar as it fails to make explicit its own criteria, however, neither does the panel. And given the importance of the questions at issue in this case, that void in the panel opinion seems to demand in banc review, for this Court ought not allow such a severe conclusion to rest on such slender legal justification.
 
 
 81
 The judges of this Court obviously disagree sharply over the serious and difficult constitutional questions presented in this case, which appear to be of first impression in this Circuit and every other. For that reason alone, if not for any other, this case would seem to demand in banc reconsideration. Cf. Koehler v. Bank of Bermuda (New York) Ltd., 229 F.3d 187, 194 (2d Cir. 2000) (Calabresi, J., dissenting from the denial of rehearing in banc); McCray v. Abrams, 756 F.2d 277, 279 80 (2d Cir. 1985) (Van Graafeiland, J., dissenting from the denial of rehearing in banc). However, because I agree that the plaintiffs' extraordinarily detailed, 94-page complaint more than sufficiently pleads facts in support of a claim that the police "created and acted upon a racial classification by setting aside all but the racial elements" in the witness's description, ante at 781-82 (Calabresi, J., dissenting), I join Judge Calabresi's opinion. I also note that given the majority's decision to deny rehearing in banc, I share the view expressed by Judges Sack and Katzmann, see ante at 779 (Sack and Katzmann, JJ., concurring), that the District Court should afford the plaintiffs an opportunity to amend their complaint on remand in light of our disposition.
 
 
 
 Notes:
 
 
 [1]
 Chief Judge Walker observes that "there have been times and places in this country in which the police have tolerated crime in African-American communities." Ante at 771 (Walker, C.J., concurring). That statement is true enough. It is equally true, however, that there have been, and continue to be, times and places in this country in which victims have been neither accurate nor innocent in their use of race to describe criminal suspects-witness, for example, the Boston Police Department's wrongful arrest of an innocent man in 1989 for the murder of Carol Stuart, based upon a witness's fabricated description of the suspect as being "a black male in his late 20s or early 30s, about 5 feet 10 inches tall and weighing 150 to 160 pounds," who spoke "in a raspy, 'sing-song' tone." Sally Jacobs & Diego Ribadeneira, No Wallet, So Killer Opened Fire, BOSTON GLOBE, Oct. 26, 1989, at 1; see also Peter J. Howe, From Nightmare to Reality, A City is Reeling, BOSTON GLOBE, Jan. 7, 1990, at 1.
 No less than when they rely upon racial classifications of their own making, the police impose tremendous social costs upon people of color when they act primarily upon the race-based suspicion of victims and other witnesses. Indeed, at least one commentator has gone so far as to describe the costs of using race-based suspicion in police investigations as imposing a "racial tax" upon people of color. See RANDALL KENNEDY, RACE, CRIME, AND THE LAW 169 63 (1997). The panel pays insufficient heed to these social costs.
 
 
 [2]
 In this respect, the panel appears to err by requiring the plaintiffs to point to a "law or policy that expressly classifies persons on the basis of race"-which, for the panel, seems to refer only to "established profile[s]" or "regular polic[ies] based on racial stereotypes"-in order to make out a viable claim under the Equal Protection Clause that an express racial classification was used. Brown v. Oneonta, 221 F.3d 329, 337 (2d Cir. 2000) (emphasis added and internal quotation marks omitted). "Established profile[s]" and "regular polic[ies] based on racial stereotypes" do not exhaust the universe of possible Equal Protection Clause violations by the police. To the contrary, "any person . . . has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995) (emphasis added).
 It is true that claims under section 1983 against government officials in their official capacities (or against the City of Oneonta itself) must show that the entity's "policy or custom . . . played a part in the violation of federal law." Hafer v. Melo, 502 U.S. 21, 25 (1991). However, the Oneonta defendants also have been sued under section 1983 in their individual capacities-and the plaintiffs need not show any connection to government "policy or custom" to support these individual capacity claims. See id. at 25. Regardless, therefore, of whether police "policy or custom" played any role in this case, dismissal of the plaintiffs' complaint based on the absence of any "policy or custom" seems inappropriate, given the plaintiffs' explicit assertion of these individual capacity claims.